ZENITH ELECTRONICS
CORPORATION, et al.,
Plaintiffs,

v.

The UNITED STATES, Defendant.

Court No. 88–02–00122.

United States Court of
International Trade.

Dec. 19, 1990.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson and J. Eric Nissley, of counsel), for plaintiff Zenith Electronics Corp.

Paul, Weiss, Rifkind, Wharton & Garrison (Robert E. Montgomery, Jr., of counsel), for plaintiffs NEC Corp. and NEC Home Electronics (U.S.A.), Inc.

Baker & McKenzie (Thomas P. Ondeck and Arthur L. George, of counsel), for plaintiffs Mitsubishi Elec. Corp. and Mitsubishi Elec. Sales America, Inc.

Siegel Mandell & Davidson, P.C. (Brian S. Goldstein, Judith M. Barzilay and David Newman, of counsel), for plaintiff Fujitsu General Ltd.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., Velta A. Melnbrencis, attorney, for defendant.

Weil, Gotshal & Manges (Stuart M. Rosen, A. Paul Victor and Charles H. Bayar of counsel), for amici curiae Matsushita Elec. Indus. Co., Ltd., et al.

### MEMORANDUM OPINION AND ORDER

WATSON, Judge:

This consolidated action covers challenges to antidumping duty determinations and involves Zenith Electronics Corporation ("Zenith"), an American manufacturer of television sets, and three Japanese manufacturers, who are Fujitsu General, Ltd. ("Fujitsu"), Mitsubishi Electric Corporation ("Mitsubishi"), and NEC Corporation and the related subsidiaries of the Japanese manufacturers. The Court has also permitted the participation of Amici Curiae.[1]

The parties contest the final determination of the United States Department of Commerce ("Commerce"), International Trade Administration ("ITA"), in *Television Receivers, Monochrome and Color, from Japan: Final Results of Antidumping Duty Administrative Review,* 53 Fed. Reg. 4050 (February 11, 1988). Commerce's determination stems from an administrative review of alleged dumping of television receivers, monochrome and color, from Japan, covering five manufacturers and/or exporters, and the periods between April 1, 1982 through March 31, 1983 and March 1, 1985 through February 28, 1986. Commerce identified a dumping margin, and assessed antidumping duties. A cash deposit was required of the manufacturers, pursuant to Commerce Department regulations. 19 C.F.R. § 353.48 (1988).

Presently before the Court are motions by Zenith, Fujitsu, NEC and Mitsubishi for judgment upon the agency record in Case No. 88–02–00122. A variety of issues are involved, related to ITA's manner of calculating and determining the antidumping duty.

Zenith asserts that Commerce must adhere to this court's ruling in *Zenith Elecs. Corp. v. United States,* 10 C.I.T. 268, 633 F.Supp. 1382 (1986) (*"Zenith I"*), which provides that under 19 U.S.C. § 1677a(d)(1)(C) (1980), the adjustments for a Japanese commodity tax must be calculated by (1) increasing the United States Price ("USP") by the amount of foreign taxes forgiven upon exports rather than

1. Briefs of Amici Curiae in support of NEC's motion for judgment upon the agency record have been filed by Victor Company of Japan, Ltd. and U.S. JVC Corp., and by Matsushita Electric Industrial Co., Ltd.; Panasonic Company and Quasar Company, divisions of Matsushita Electric Corporation of America; Panasonic Hawaii, Inc.; and Panasonic Sales Company, a division of Matsushita Electric of Puerto Rico, Inc.

decreasing the Foreign Market Value ("FMV") by that amount, and by (2) "capping" or limiting the adjustment to the amount of such taxes that are actually included in the home market price of the comparison merchandise, or "passed through" to the consumer in the home market.[2] Claiming that the Department of Commerce ignored the court's ruling in *Zenith I*, Zenith asserts that Commerce erred by (1) using a circumstances of sale adjustment to neutralize the effect of the tax adjustment, and (2) by failing to cap the tax adjustment to USP at the amount of tax added to, included in, or actually "passed through" in the home market price.

Fujitsu claims that Commerce correctly made the circumstances of sale adjustment for commodity tax in the home market, and that it should also have done so in calculating the cash deposit rate for estimated dumping duties.[3]

Fujitsu and NEC argue that Commerce erred in failing to adhere to a settlement agreement entered into with twenty-three importers of Japanese color television receivers[4] on April 28, 1980 ("Settlement Agreement"). In particular, they claim that in calculating the dumping margin in this case, Commerce departed from the "traditional methodology" for such calculations to which it was bound by the Settlement Agreement.[5] The defendant, United States, opposes this argument, claiming that the "traditional methodology" referred to a departure from the commodity tax method for deriving the FMV, and a return to the previously used method of adjusting U.S. and Japanese prices pursuant to the statute. NEC also argues that Commerce applied fixed rules to some of its determinations without complying with the Administrative Procedure Act.

Fujitsu and NEC further argue that in its calculation of the FMV to be compared to the USP, Commerce wrongfully considered *all* markets in Japan, rather than *"principal* markets," which compose the "ordinary course of trade." Fujitsu claims that farmers' cooperatives as well as small retail stores in rural areas of Japan should have been excluded from the calculations because they are not principal markets, and operate outside of the ordinary course of trade.

Remaining issues for which the parties seek relief are:

–Fujitsu claims that imputed finance costs in the home market should be calculated, and FMV adjusted appropriately.

–Fujitsu claims that Commerce should have included indirect selling expenses (attributable to its Domestic Marketing Group) in the exporter's sales price (ESP) offset claim.

–NEC claims that Commerce erred in disallowing its claimed adjustment for advertising and sales promotional expenses; in refusing to make "level of trade" adjustments; and, in failing to deduct the full amount of NEC's home market warranty and inland freight expenses from the FMV.

–Mitsubishi claims that Commerce misinterpreted Japanese commodity law, and based its calculation on transfer prices to related sales subsidiaries rather than sales by a related company to an unrelated customer; incorrectly used a time period for calculating advertising expense other than the fiscal year to which

---

**2.** The relevant provision of the statute states: The purchase price and the exporter's sales price shall be adjusted by being ... increased by ... the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.
 19 U.S.C. § 1677a(d)(1)(C).

**3.** Mitsubishi and NEC also assert that Commerce erred in failing to calculate this adjustment in its determination of the cash deposit rate, as it did in its duty assessment calculation.

**4.** Fujitsu and NEC were among the importers.

**5.** Amici Curiae support NEC's claim that Commerce wrongfully abandoned its previously employed "traditional methodology" by making an unwarranted and retroactive change in its calculating practice.

this review pertains; incorrectly calculated home market freight expense; erred in not adjusting for differences in circumstances of sale as mandated by *Timken Co. v. United States*, 11 C.I.T. 786, 673 F.Supp. 495 (1987); incorrectly deemed warranty labor payments to a related warranty service company indirect expenses; and made several technical errors.

## BACKGROUND

The Antidumping Act[6] provides relief to a domestic industry which is materially injured or threatened with material injury by the sale of foreign goods in this country at less than fair value ("LTFV"), or below the market value of those goods in the country of exportation. The Act authorizes the Secretary of the Treasury to determine when such dumping occurs, or is likely to occur, and to impose a duty in such circumstances to eliminate the margin of dumping. 19 U.S.C. § 1673 (1980). The Act is not intended to penalize the foreign industry, but to protect the domestic industry which is likely to be injured or prevented from being established by the sale of foreign goods in the United States market at LTFV.[7]

An antidumping duty investigation is commenced when the administering authority determines that it is warranted. 19 U.S.C. § 1673a. Except where there is a negative finding and review is dismissed, there is a preliminary determination, 19 U.S.C. § 1673b, generally followed by a final determination. 19 U.S.C. § 1673d. An antidumping duty is then assessed and imposed, and the deposit of estimated duties is required pending liquidation of the entries of merchandise. 19 U.S.C. § 1673e.

The amount of antidumping duty, imposed to correct the "dumping margin," is determined by comparing the FMV to the USP. 19 U.S.C. § 1677b. In making this comparison, various adjustments are made for certain costs, expenses and duties, pursuant to statute.[8] The "absolute dumping margin" for a sale is the amount by which FMV exceeds USP after the appropriate upward and downward adjustments are made, pursuant to statutory provisions and Commerce Department regulations.

■ The dumping margin should not be increased as a result of taxes assessed on the home market but forgiven on export sales by the country of exportation. Thus, the statute provides that an offset adjustment should be used in calculating USP to compensate for such a home market tax, stating that the purchase price and exporter's sales price shall be increased by:

[T]he amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason

6. 19 U.S.C. § 1671 et seq.

7. *See* R. Sturm, Customs Law and Administration § 48.1 (1990).

8. Section 1677a(d) provides:

The purchase price and the exporter's sales price shall be adjusted by being—
(1) increased by—
(A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States;
(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reasons of the exportation of the merchandise to the United States;
(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof,

which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United states, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.
(2) reduced by—
(A) except as provided in paragraph (1)(D), the amount, if any, included in such price, attributable to any additional costs, charges, and expenses and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and
(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the country of exportation on the exportation of the merchandise to the United States other than an export tax, duty or other charge described in section 1677(6)(C) of this title.

of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

19 U.S.C. § 1677a(d)(1)(C).

■ In *Zenith I,* this Court discussed that issue at length, recognizing that the above adjustment consists of two components. First, the USP "is to be increased by the amount of foreign taxes imposed directly upon the exported merchandise ... which have been forgiven (rebated or not collected) because the merchandise was exported to the United States." *Zenith I,* 10 C.I.T. at 272, 633 F.Supp. at 1385. In other words, the statute does not provide for the FMV to be *reduced* by the amount in question, but for the USP to be *increased.* "Second, the adjustment is to be limited or 'capped' by the amount that such taxes are added to or included in the price of comparison merchandise sold in the home market." *Id.* This means that when the foreign manufacturer absorbs some or all of the tax imposed, the increase to USP is not to exceed the amount of the tax which is actually "passed through" to the foreign market consumer.

■ In part, this case is concerned with Commerce's interpretation of the tax adjustment portion of the antidumping statute. Additional issues, listed above, pertain to other adjustments made in calculating the absolute dumping margin. In certain instances, it is the foreign manufacturer or importer's burden to provide commerce with adequate information to enable it to determine whether expenditures in the foreign market qualify as reductions to the FMV provided for by 19 U.S.C. § 1677b(a)(2).

## ITA PROCEEDINGS

The ITA published its final determination on February 11, 1988,[9] addressing comments received in response to its preliminary results [10] from Zenith, NEC, Mitsubishi and Fujitsu.[11] The arguments presented by parties in this case are responsive to various positions taken by ITA in that determination. We refer only to those determinations which are now being challenged.

In its final determination, Commerce agreed that the statute requires that the commodity tax forgiven by reason of export must be added to USP. However, it states that, "[t]o avoid artificially inflating or deflating margins, we made circumstances-of-sale adjustments, where appropriate." 53 Fed.Reg. at 4051. Commerce also states that it disagrees with this court's decision in *Zenith I* that foreign taxes which are rebated or forgiven upon exportation of merchandise should be capped at that amount actually "passed through" to the consumer in the foreign market. Commerce gives several reasons for its decision to continue "to assume that all indirect taxes in the home market are passed through to the ultimate customers." *Id.*

In stating its position regarding the effect of the 1980 settlement agreements and its obligation to adhere to a "traditional methodology" for calculating FMV, Commerce refers to its previous determination in 52 Fed.Regs. 8940, 8942 (March 20, 1988). There, Commerce states "the phrase 'traditional methodology' is limited to the calculation of foreign market values based upon information and data supplied by Japanese respondents." *Id.* at 8942. Commerce asserts that the settlement agreement binds it to use a "traditional methodology" only to the extent that "[i]t precludes future use of the 'commodity tax' method in calculating FMV." *Id.*

Commerce refused to exclude sales to farmers' cooperatives and small retail stores in Japan in calculating FMV, claiming that no evidence was presented to show that these sales were outside of "principal markets," or the "ordinary course of

---

**9.** 53 Fed.Reg. 4050 (1988).

**10.** Published at 52 Fed.Reg. 27,234 (July 20, 1987).

**11.** The ITA also received comments on its preliminary determination from some respondents regarding mathematical or clerical errors. Such errors were corrected, and are not specifically addressed in the final determination. 53 Fed.Reg. 4051.

trade." *Id.* at 4053. Commerce also refused to make any adjustment for Fujitsu to account for imputed financing costs in the home market, claiming that the data necessary for calculating such costs was not provided.

In response to Fujitsu's request that an adjustment be made for home market indirect selling expenses (attributable to the Domestic Marketing Group) in the ESP offset, Commerce asserts that Fujitsu first made this claim in its pre-hearing brief. Commerce considers that too late in the review to be considered or verified. *Id.* at 4054.

Commerce disallowed NEC's claimed adjustments for home market advertising and sales promotion expenses, because they could not be satisfactorily verified. *Id.* at 4053. In regard to deductions from FMV for home market warranty expenses, Commerce found that the labor portion of NEC's warranty claim was performed by a related service company, and thus was a fixed cost not directly related to sales in this period. As such, Commerce claims it was included in the ESP offset. *Id.* at 4053–54. Commerce agreed with Zenith's claim that the labor portion of Mitsubishi's home market warranty claim consists of expenses incurred by a related service company. For that reason, Commerce found they should be treated as an indirect expense. *Id.* at 4052.

Commerce claims that it correctly refused to make a level of trade adjustment to account for NEC's sales companies profits in the foreign market.[12] However, those expenses were claimed in the ESP offset, as Commerce considers them indirect selling expenses. *Id.* at 4053.

Commerce disallowed NEC's claim for deduction of home market inland freight expenses, finding that the expenses could not be satisfactorily verified. *Id.* at 4054.

### CIRCUMSTANCE OF SALE ADJUSTMENT

■ In its determination, Commerce concedes that "the amount of commodity tax

forgiven by reason of the export of televisions to the United States must be added to USP under the Statute." 53 Fed.Reg. at 4051. That is in accordance with the statute, and with the Court's clear interpretation of that portion of the statute, as set out in *Zenith I*, 10 C.I.T. at 278–79, 633 F.Supp. at 1389. However, that is not the operative part of the statute which we are concerned with here. Rather, it is Commerce's alleged attempt to nullify the effect of that requirement which is in dispute.

Commerce states that in order "[t]o avoid artificially inflating or deflating margins, [it] made circumstances-of-sale adjustments where appropriate." 53 Fed.Reg. at 4051. In effect, that policy tends to avoid the directive of the statute, rather than to avoid "artificially inflating or deflating margins." The statute clearly provides for adjustments to price based on taxes rebated upon exportation, directing that the USP be "increased by ... the amount of any taxes imposed in the country of exportation directly upon the exported merchandise ... which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States." 19 U.S.C. § 1677a(d)(1)(C).

Although failing to attribute its circumstance of sale determination to a particular clause, Commerce apparently believes it finds the authority for the adjustment in the statute. That section states:

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to—

(b) other differences in circumstances of sale; then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4)(C).

This Court need not completely restate its position on the issue of tax-related cir-

---

**12.** NEC sought deductions from FMV for profit, selling, general and administrative expenses incurred by its sales companies.

cumstances of sale adjustments, which was examined in great detail in *Zenith I.* The Court finds that § 1677b(a)(4)(C) is not an omnibus provision to be used by the parties for whatever adjustment they seek to effect. Rather, the statutory significance of "other circumstances of sale" is to provide a means for addressing those items *not otherwise included in the statute.* Since the adjustment for tax rebated by reason of exportation is specifically provided for in § 1677a(d)(1)(C), there is no justification for readjusting it under a provision for "other differences in circumstances of sale." [13]

Zenith asserts that in *Zenith I,* it argued that "the Act does not contemplate complete tax neutrality in all instances and that the differences in circumstances of sale adjustment authority cannot be exercised to nullify the tax adjustment." Brief for Plaintiff at 7. This Court agrees, as fully discussed in that opinion. *See Zenith I,* 10 C.I.T. at 279–81, 633 F.Supp. at 1392–93. That fact that the relevant provisions of the antidumping law provide for adjustments to compensate for actual taxes rebated upon exportation indicates that the desired result should come as close as possible to an adjustment pertaining to an actual occurrence. It defies logic to assume that Congress then provided that the adjustment could be rendered meaningless

by a difference in circumstance of sale adjustment.[14]

Commerce misunderstands the significance of the Court's previous determination regarding this issue. The issue is not whether Commerce is bound to follow *Zenith I.* Rather, the Court's interpretation of the law as set out in *Zenith I* remains this Court's interpretation of the law. Absent a reversal of the specific point by the Court of Appeals, this Court considers that interpretation correct. We are not concerned with whether Commerce "misbehaved" in failing to follow a previous determination. We are only concerned with seeing that the law receives its correct interpretation.[15] Contrary to Commerce's belief, there is no indication that the legislative history or GATT support its use of circumstance of sale adjustment, and the Court holds that its method is contrary to the statute.[16]

Commerce was correct in adding the amount of tax forgiven upon exportation to the USP, rather than deducting it from the FMV. The statute is clear on this,[17] and the parties do not dispute it. Furthermore, the Court has recognized that *Zenith I* requires it. *See AOC Int'l, Inc. v. United States,* 721 F.Supp. 314, 321–22 (CIT 1989); *Daewoo Electronics Co. v. United States,*

---

13. Commerce Department regulations do not include rebate of foreign market tax upon exportation as a circumstance of sale triggering this adjustment. Consistent with the court's interpretation, the regulation states:

Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also generally will be made for differences in advertising and other selling costs of a seller unless such costs are attributable to a later sale of the merchandise by a purchaser.

19 C.F.R. § 353.15(b) (1988).

14. In a recent case, a plaintiff asked the Court the direct the ITA to grant an adjustment to USP for tax rebated upon exportation, pursuant to § 1677a(d)(1)(C). Plaintiff requested that in the alternative, a circumstance of sale adjustment should be required, pursuant to § 1677b(a)(4)(B). Finding that the evidence supported the adjustment for tax rebate, the

Court failed to reach the circumstance of sale issue. *See Industrial Quimica Del Nalon, S.A. v. United States,* 729 F.Supp. 103 (CIT 1989).

15. The Court considers arguments regarding the nature of "dictum" superfluous. *Zenith I* represents the Court's interpretation of the law then and now.

16. In *Sawhill Tubular Div. Cyclops Corp. v. United States,* 11 C.I.T. 491, 666 F.Supp. 1550 (1987), the Court held that the ITA's determination to make a circumstance of sale adjustment was reasonable. In that case, the claimed adjustment related to certain export payments identified alternatively in the record as an "uncollected or rebated tax and duty," an "import duty drawback," a "difference in material cost," and a "circumstance of sale." *Id.* 11 C.I.T. at 492 n. 1, 666 F.Supp. at 1551 n. 1. In reaching its decision, we will assume the Court, although silent on the point, did not select "rebated tax and duty" as the operative alternative.

17. 19 U.S.C. § 1677a(d)(1)(C).

712 F.Supp. 931, 955 (CIT 1989). Thus, there is no question that "the provision calls for an upward adjustment to USP (rather than a downward adjustment to FMV) in the amount of tax that would have been assessed on the exported merchandise had it been sold in the home market." *Zenith I*, 10 C.I.T. at 276, 633 F.Supp. at 1389.

The issue is whether a circumstance of sale adjustment was appropriately made in order to achieve "tax neutrality." For reasons set out here and in *Zenith I*, the Court holds that it was not. Not only does the antidumping law specifically provide the manner in which such tax should be treated, 19 U.S.C. § 1677a(d)(1)(C), but there is nothing which indicates that this tax is again provided for under "other differences in circumstances of sale." 19 U.S.C. § 1677b(a)(4)(B). Commerce's own regulations give no such indication, *see* 19 C.F.R. § 353.15(b), and such tax is not included in its list of examples of differences in circumstances of sale. *See Smith–Corona Group v. United States*, 713 F.2d 1568, 1574 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

In *Zenith I*, the Court recognized that "[t]he antidumping law does not support the proposition that a tax differential generated by actual dumping constitutes an adjustable difference in the circumstances of sale under § 1677b(a)(4)(B)." *Zenith I*, 10 C.I.T. at 280, 633 F.Supp. at 1393. No support for any other reading of the statute is evident, thus no adjustment for commodity tax assessed on sales in the foreign market and rebated upon exportation shall be allowed.

■ In another aspect of its determination, Commerce concluded that it would "continu[e] to assume that all indirect taxes in the home market are passed through to the ultimate customers." 53 Fed.Reg. at 4051. Stating disagreement with the

Court's previous ruling, Commerce refused to "attempt to measure the amount of tax 'passed through' to customers in the Japanese market for several reasons." [18] *Id.* Commerce asserts three reasons for its refusal to follow *Zenith I*'s directive:

(1) [W]e do not agree that the statutory language limiting the amount of the adjustment of the commodity tax "added to or included in the price" of televisions sold in Japan requires the Department to measure the incidence of the tax in an economic sense.

(2) [A]pplying such an interpretation would be contrary to the obligations of the United States under the GATT Dumping Code.

(3) [M]easuring the incidence of the commodity tax in Japan would be an enormous and extremely complex task.

*Id.*

Zenith argues that by "calculat[ing] the adjustment by multiplying the ex-factory price by the tax rate and adding the result to USP," Commerce "completely ignored this Court's express ruling that the statute requires capping the adjustment at the amount of tax added to or included in the price of home market comparison merchandise." Brief for Plaintiff at 11. Commerce, however, asserts that "the statute does not require that the adjustment to U.S. price be capped by 'the amount' of tax added to or included in the home market price." Defendant's Memorandum in Opposition at 53.

In fact, and as discussed above, the statute's directive on this issue is clear. In no uncertain terms, the statute provides:

The purchase price and the exporter's sales price shall be adjusted by being … increased by … the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been

**18.** Commerce states that it will not conform to *Zenith I*'s ruling on this issue "pending a final decision on whether the Government will appeal." 53 Fed.Reg. 4051. Since its determination, the Government's appeal has been dismissed as failing to meet the case or controversy requirement. *See Zenith Elecs. Corp. v. United States*, 875 F.2d 291 (Fed.Cir.1989). Upon

remand pursuant to *Zenith I*, Commerce's calculations resulted in a finding that 100% of the tax had actually been passed through to the foreign market consumer. That being so, the Court of Appeals refused to issue an "advisory opinion" on *Zenith I*'s requirement that Commerce measure the tax pass-through. *Id.* at 293.

rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but *only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.*

19 U.S.C. § 1677a(d)(1)(C) (emphasis supplied).

This question may be resolved by referring to the Court's lengthy interpretation of the statute's pass-through clause in *Zenith I*. As stated there:

Congress had become aware that indirect taxes, including taxes imposed directly on merchandise, often were not fully shifted forward to purchasers; and Congress did not want the adjustment for such a tax to increase United States price calculations by an amount greater than the price increase which the tax generated in comparison home market sales.

*Zenith I,* 10 C.I.T. at 284, 633 F.Supp. at 1396.

Commerce incorrectly justifies its failure to consider pass-through by claiming that "C–O–S adjustment[s] ha[ve] precisely the same effect on the absolute margin as the 'cap' [in that] they prevented that addition from reducing the margin by an amount by which the imputed tax on the exported model exceeded the tax on the home market model." Defendants' Memorandum in Opposition at 54. It is not Commerce's place to determine that substitution is an acceptable alternative to adherence to statutory directive, using its own means to achieve what it claims are the statutory ends.

Commerce's reasons for refusing to follow the statute's directive, as clarified in *Zenith I*, are unacceptable. The statutory language certainly requires that the "incidence of tax" passed through to consumers in the home market be measured. If Commerce was correct, "then the statute's requirement that these rebates create an adjustment only to the extent the cost of the tax is passed on would be meaningless."

*Huffy Corp. v. United States,* 10 C.I.T. 214, 221, 632 F.Supp. 50, 56 (1986). *See also Atcor, Inc. v. United States,* 11 C.I.T. 148, 158, 658 F.Supp. 295, 303 (1987).

Finally, we cannot excuse Commerce from adhering to statutory directives because doing so would "be an enormous and extremely complex task." The Court need not explain why that is no excuse for disregarding the law. Furthermore, correct interpretation of the statute is not contrary to GATT.

As stated in *Zenith I,* "[t]o permit the ITA to assume, without any evidentiary basis, that home market price always reflects the full amount of such taxes would effectively render the pass-through clause a nullity and would defeat the express will of Congress." 10 C.I.T. at 288, 633 F.Supp. at 1399. This Court sees no reason to alter that interpretation of the statute, and Commerce is bound to apply it lawfully.

## TRADITIONAL METHODOLOGY

■ As previously stated, Fujitsu and NEC claim that Commerce failed to adhere to the April 28, 1980 Settlement Agreement which it entered into with a number of Japanese importers.[19] The departure claimed is that Commerce failed to use the "traditional methodology" in its calculations in the manner agreed to in the Settlement Agreement. The government's response is, in essence, that the "traditional methodology" refers not to an exact manner of calculation, but to a departure from the commodity tax method of deriving the FMV and a return to the method which was previously used.

In reaching its determination, the ITA refers to its finding in 52 Fed.Reg. 8940 (1987). There, Commerce elaborates on its reason for rejecting the importers' argument that it had "agreed to ascertain statutory FMV precisely as it had in the past … in calculating home market advertising, sales promotion, and warranty expenses." 52 Fed.Reg. 8942. Commerce states:

19. The United States' authority to enter into such agreements was upheld by the Court in *Committee to Preserve Am. Color Television v.*

*United States,* 2 C.I.T. 208, 218, 527 F.Supp. 341, 350 (1981).

[T]he phrase "traditional methodology" is limited to the calculation of foreign market values based upon information and data supplied by Japanese respondents. It precludes future use of the "commodity tax" method in calculating FMV.

*Id.* at 8943.

The pertinent part of the Settlement Agreement states:

6. With respect to the appraisement and liquidation of entries of television receivers from Japan subsequent to March 31, 1979 under T.D. 71–76, the parties agree:

. . . . .

(h) That the United States shall utilize the traditional methodology in calculating foreign market values, purchase prices and exporter's sales prices based upon information and data supplied by the Company and the Japanese manufacturer(s)/exporter(s) from which it has purchased or will purchase unless the United States justifiably concludes that the data submitted by the Company and the Japanese manufacturer(s)/exporter(s) from which it has purchased or will purchase is untimely, materially inaccurate or incomplete. For the purposes of this subparagraph, *"traditional method: ology" includes the method under which entries under T.D. 71–76 were assessed and liquidated prior to March 31, 1978, as altered by any changes in that method reflective of applicable amendments to the Antidumping Act, or the regulations and practices thereunder;*

. . . . .

(j) That the United States shall promptly revoke or modify T.D. 71–76 as soon as circumstances warrant such revocation or modification in accordance with procedures set forth in the applicable regulations of the Commerce Department.

. . . . .

11. This agreement represents the entire understanding and agreement between the Company, its subsidiaries, af-filiates, parents, officers, directors, employees, representatives, agents and assigns, on the one hand, and the United States, on the other hand, in respect to the subject matter hereof, and supersedes any prior negotiation, letter or understanding relating to the subject matter hereof.[20]

(Emphasis supplied).

Fujitsu asserts that Commerce departed from its obligation to adhere to the "traditional methodology" agreed to in the Settlement Agreement with regard to calculating advertising, sales promotion, warranty expenses and other circumstance of sale adjustments.

Fujitsu asserts that ascertaining the meaning of "traditional methodology," requires consideration of, "(1) the statutes, regulations and established practices existing prior to March 31, 1978; (2) any statutory or regulatory changes which alter that methodology; [and] (3) the methodology used by Commerce immediately after the agreement was signed to lend content to the phrase 'traditional methodology.' " Fujitsu's Memorandum in Support of Motion for Judgment Upon Agency Record at 21. In making that assertion, Fujitsu assumes that its own interpretation of "traditional methodology" is contained within the Settlement Agreement. That is not the case. We are not concerned with the process the United States must go through when it seeks to make alterations which the agreement provides for. Rather, we are concerned with the intended definition of "traditional methodology," as understood by the parties, at the time the agreement was entered into. The Court must determine whether any deviation at all would conflict with the meaning of "traditional methodology," or whether a more general meaning was intended which would not preclude some variance.

Paragraph Eleven of the Settlement Agreement states that it "represents the entire understanding and agreement" between the parties. Thus, the agreement's

---

**20.** This paragraph suggests that the meaning of "traditional methodology" should be derived from the language of the Settlement Agreement itself.

interpretation is limited by its own language. That being so, the meaning of "traditional methodology" is not to be found among the various parties' arguments regarding their disparate interpretations.

Fujitsu also argues that in "promulgat[ing] this new practice, Commerce has not complied with the requirements of the Administrative Procedure Act." Absent such compliance, Fujitsu asserts that Commerce "is prohibited from changing its method of calculating adjustments for advertising, sales promotion and warranty expenses from that method used immediately prior to the signing of the settlement agreement." Fujitsu's Memorandum at 23–24.

Two briefs of Amici Curiae assert that Commerce is required by the Settlement Agreement to utilize the "traditional methodology" in determining circumstances of sale adjustment and FMV, exporter's sales price (ESP), and purchase price (PP). They claim that the required "traditional methodology" encompasses all aspects of the methodology used in T.D. 71–76, prior to March 31, 1978, "except as altered to reflect applicable amendments to the antidumping law, or the regulations and practices thereunder."

Amici allege that under the "traditional methodology," circumstances of sale adjustments for such items as advertising, sales promotion, and warranty and servicing expenses were made by allocating those expenses, as recorded by the company for product lines, to individual models on a *pro rata* basis. In the case of certain companies, including Matsushita, FMV was determined based on home market sales to related and unrelated distributors rather than sales from distributors to their dealers.

Amici argue that in January, 1984, Commerce compelled companies involved in reviews to identify and quantify COS adjust-

ments for individual home market models on an "item-by-item" basis. This method required manual review of invoices, receipts, etc., in order to ascertain whether each expenditure can be attributed to a specific model. Amici claim this approach imposes a tremendous burden, is unreasonable, and "threatened to improperly alter the 'traditional methodology.'"

Amici assert that in the final results of the 2nd round review, on June 10, 1985, Commerce announced its abandonment of the allocation method of determining circumstance of sale adjustments. Future reviews would be conducted by applying the "item-by-item" approach, and other alterations in method were made which Amici assert are unwarranted deviations from the traditional methodology.[21]

After reviewing the record in this case, the arguments of the parties and the background of the settlement agreement which, among other things, gave rise to the "traditional methodology" in dispute, the Court finds that the government has not violated the agreement. The primary purpose of the traditional methodology provision in paragraph 6(h) was to insure that Commerce stopped using the commodity tax methodology which it had begun using in early 1977 and committed itself to use a methodology in which the prices of individual transactions in Japan and the United States were adjusted. This was the broad and general purpose of using the phrase "traditional methodology" and the Court has not been persuaded that the term was intended to confine Commerce to any specific techniques of adjustment. This conclusion is supported by the background, the history of the agreement, and by a proper reading of the language used in expressing the agreement.

In early 1977 there was a four to five-year backlog of unliquidated television entries which had an entered value of approx-

---

**21.** These include:
(a) application of the item-by-item approach to quantifying selling expenses on the *USP* as well as the *FMV* side of the dumping comparison; (b) disallowance of any labor warranty expenses as part of the FMV direct selling expenses adjustment; (c) imputation of theoretical "opportunity" costs to respondents, including a credit "opportunity" cost for the period that merchandise is in inventory.
Brief of *Amici Curiae* Victor Co. at 7.

imately one billion dollars. In the face of this tremendous backlog, Customs decided to use a shortcut method for deriving foreign market values for Japanese televisions and relied on a formula in the Japanese commodity tax law. In that shortened technique Customs could simply determine foreign market value by taking the suggested retail price for a particular television model and multiplying it by the appropriate percentage determined under the Japanese law. The fact that no adjustments were permitted to the foreign market value which was derived from the commodity tax formula simplified the procedure immensely. The resulting dumping margins led to total dumping duties of approximately $400,000,000. When responsibility for administering the antidumping laws was transferred to the Department of Commerce in 1980, Commerce settled the dispute, which had been going on for years, by entering into settlement agreements with the Japanese manufacturers in April of 1980.

Under the agreements, the United States waived its claims for antidumping duties for televisions imported into the United States prior to April, 1979, in exchange for cash payments from the Japanese companies totaling approximately $66,000,000. Under paragraph 6(h) of that agreement, Commerce agreed in conducting future administrative reviews, to utilize the "traditional methodology" in calculating foreign market values. Against this background it appears to the Court that the primary purpose of using the phrase "traditional methodology" was to harken back to the general approach by which foreign market value was calculated through adjustments to the prices in Japan and the United States.

When the specific language defining traditional methodology is examined it is further seen that the term is used, not as a term of strict limitation, but as a general descriptive characterization of a broad approach to the subject. First, the definition of "traditional methodology" in paragraph 6(h) states that it "includes" the methodology used in review under T.D. 71–76 before March 31, 1978. In normal interpretation of contracts and statutes, the use of the term "includes" indicates that what follows is exemplary and not restrictive. Secondly, the language of definition states that the methodologies are included "as altered by any changes reflective of applicable amendments to the antidumping act, or the regulations and practices thereunder." To the Court, this clearly indicates that the agreement contemplated a flexibility to the traditional methodology and specifically provided that it could evolve in a number of ways. Nothing in this definition indicates that the traditional methodology bound Commerce to retain or restore any specific types or techniques of individual adjustments.

In sum, the Court holds that by agreeing to use traditional methodology the Commerce Department did not bind itself to maintain specific forms and amounts of adjustments sought by the plaintiffs. It obligated itself only to abjure use of the commodity tax method and was free to develop any embodiment of traditional methodology which was consistent with administrative practice and law.

NEC argues that portions of Commerce's determination were reached by means of the application of rules which had not been formally adopted in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq. Specifically, NEC contends that Commerce's determination with respect to the principal markets of Japan, to the adjustment for home market advertising sales promotion, and its determination on warranty expenses should be overturned because they applied fixed rules which had not been adopted pursuant to the APA. The APA provides that " 'rule' means the whole or a part of an agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirement of an agency...." 5 U.S.C. § 551(4) (1982). The APA also provides that its notice and comment requirements do not apply "to interpretative rules, general statement of policy or procedure, or practice." 5 U.S.C. § 553(b)(A) (1982).

■ The question of what administrative conduct falls under the rubric of rule-making has been a fertile source of litigation. The basic principle used by the courts in approaching this problem, and probably the only one on which there is general agreement, is that the courts must look beyond the superficial characterization of the administrative action in order to determine whether rule-making procedures were required. *CBS, Inc. v. United States*, 316 U.S. 407, 419, 62 S.Ct. 1194, 1201, 86 L.Ed. 1563 (1942). The dominant characteristic of a rule, in the opinion of the court, is that it represents a fixed and invariable limitation on the discretionary authority of the administrative agency. In this court there have been two recent notable examples of administrative conduct which was found to have embodied "rules." In *Carlisle Tire & Rubber Co. v. United States*, 10 C.I.T. 301, 634 F.Supp. 419 (1986), the Court was confronted with an announced practice by the Department of Commerce that entries made on or after January 1, 1980 which were subject to aggregate net subsidy rates of less than 0.5% ad valorem would be subject to a *de minimis* principle and would be considered to have received a benefit which was so small that it was of no significance. The Court held that such a rule had to be promulgated in accordance with the notice and comment provisions of the APA. In *Ipsco, Inc. v. United States*, 687 F.Supp. 614 (CIT 1988), the Court faced a specific formula used by the Department of Commerce to determine how the benefits received from grants should be allocated over a period of time.

■ In the present case it was the Commerce Department's rejection of certain adjustments sought by NEC for advertising expenses, sales promotions, and warranty costs, and its treatment of "principal markets" which raised the issue of whether or not Commerce was engaged in rule-making. NEC argues that the results with respect to those subjects flowed from the mechanical implementation of fixed standards and were not matters involving the flexible application of general statements of policy to the specific facts of the case.

NEC contends that Commerce applied an automatic model-specific requirement for proof of expenses in advertising and sales promotion without regard to NEC's particular facts in this proceeding. It also contends that Commerce automatically applied a fixed model-specific warranty methodology to NEC without regard to the relevant facts in this case.

Finally, NEC contends that Commerce's position on "principal markets" amounts to adopting a presumption that principal markets are all the markets in the country of exportation and is therefore the equivalent of a fixed rule to that effect.

In close examination of the subjects which NEC claims were decided on the basis of unlawfully utilized rules, the Court is not persuaded that the results were dictated by automatic, mechanical, or inflexible guidelines. The Court sees distinctions between the factors which led to the results here challenged and the factors which led to those results in other cases which were found to be the outcome of fixed rules. In the result reviewed in *Carlisle*, the principal that benefits which resulted in aggregate net subsidy rates of less than 0.5% *ad valorem* were not countervailable, was not open to alteration. It was a fixed mechanical and mathematical rule. In the conduct examined in *Ipsco*, the Court found "a hard and fast rule regarding the period of time over which to allocate benefits received from grants." 687 F.Supp. at 627. Here, however, the results do not appear to have been preordained or made automatic by the practices involved.

With respect to the question of "principal market" the record supports the conclusion that Commerce was·open to the possibility that principal markets could be less than all markets in Japan. The result it reached was not due to an inalterable rule that principal markets would always be all markets in Japan but rather, a finding that NEC had failed to furnish evidence to support its assertion that principal markets should be less expansive. *See* 53 Fed.Reg. 4053 (Comment 33). This was not a result which came about because of an inflexible rule concerning the definition of markets.

Rather, it is a result reached by following the broad principle that those respondents who want to receive a claimed adjustment must provide the agency with substantial evidence in support of that adjustment.

With respect to Commerce's calculation of NEC's warranty expenses on a model-specific basis, the Court does not find that this was the result of an inflexible policy of always calculating warranty expenses on a model-specific basis. The Court finds that this was a practice which related to the manner in which companies' records were kept. In the case of companies which do not keep their warranty records on a model-specific basis, Commerce apparently does not calculate the adjustment in that manner. See *Study of Antidumping Adjustments Methodology and Recommendations For Statutory Change* (Nov. 1985), at p. 48. In the context of this case the use of model-specific allocation for NEC appears to have been the agency's allowable adjustment of its adjudicatory and investigative functions to the form in which the information was maintained by NEC. It does not appear to have been a hard and fast rule that nothing except model-specific information would be acceptable.

Finally, the subject of home market advertising sales promotion expenses was not resolved by virtue of a fixed rule. While it does appear that Commerce was moving towards the rigid use of model-specific allocation over the last few years, the most important development is that it now believes that model-specific allocation in that area leads to inaccurate and erratic results in many instances and has requested the Court to remand the proceeding so that advertising and sales promotion expenses can be allocated on a product line basis. As a practical matter, this removes the subject of advertising expenses from the dispute about rule-making and would make any opinion by the Court on that subject pointless. Therefore, this matter shall be remanded to Commerce.

For the reasons given above, the Court finds that the notice and hearing requirements of the APA should not apply to the determinations made by Commerce with respect to NEC's advertising expenses or warranty expenses, or to the subject of the "principal markets" of Japan.

Fujitsu and NEC have claimed that in calculating FMV, Commerce wrongfully considered all markets in Japan rather than the assertedly more limited "principal markets" used in the statutory definition of FMV. NEC objects to Commerce's use of sales to distributors outside the Tokyo and Osaka areas, and Fujitsu objects to the inclusion of sales to farmers' cooperatives.

 The term "principal markets" is not defined in the antidumping law. It has become clear that the meaning of terms used in customs law, either for classification or valuation purposes, cannot be automatically transferred to the field of antidumping law. *Cf. Zenith Radio Corp. v. United States,* 9 C.I.T. 110, 113–16, 606 F.Supp. 695, 700–01 (1985), *aff'd,* 783 F.2d 184 (Fed.Cir.1986). This means that determining FMV Commerce is not restricted to those places in which the majority of home market sales occur. Nor is there any basis in the law to confine Commerce to those markets which are in the most populous sections of the country. In short, it was perfectly reasonable for Commerce to view "principal markets" as those markets throughout the country in which the product was usually sold, and to leave open for exclusion from principal markets only those places in which sales were not normally made. Using this standard, Commerce was correct in concluding that there had been no showing that the principal markets were less than the usual markets throughout Japan. The mere fact that sales to farmers cooperatives were made in rural areas does not provide a logical basis for the Court to distinguish them, particularly in view of the fact that the record shows a significant amount of such sales. The conclusion that Commerce's concept of principal markets was in accordance with the law also disposes of any arguments that the prices it found in those markets had to be further adjusted to account for differences between the markets used and the statutory norm.

■ Fujitsu claims that Commerce should have imputed a financing cost to the televisions sold in the home market for the entire period they were held in inventory, i.e., from the date of production to the date of sale, and argues that the failure to do so was inconsistent with the fact that Commerce imputed such inventory costs on the U.S. side and deducted them from the U.S. price. In its determination, Commerce concluded that no adjustment was warranted because Fujitsu had not provided the necessary data. Fujitsu also argues that if that was so, Commerce should have sought additional information on that subject.

The adjustment sought by Fujitsu is not one required by 19 U.S.C. § 1677b because home market pre-sale expenses would appear to be general overhead expenses for which no adjustment is permitted. This Court has previously affirmed Commerce's practice of removing from ESP the imputed cost of financing exported merchandise from the date of exportation to the date of resale in the United States, and has not found such practice inconsistent with the refusal to remove imported costs of financing home market merchandise prior to its sale. *Silver Reed Am., Inc. v. United States*, 683 F.Supp. 1393 (CIT 1988).

The adjustment which Fujitsu seeks arises under the Commerce regulation which, *inter alia,* permits a limited adjustment of FMV when a comparison is made using ESP. As such, it is an adjustment which must be established by the party seeking it. Fujitsu did not provide the data needed to calculate the appropriate imputed financing costs.

■ Fujitsu also argues that Commerce should adjust FMV for indirect selling expenses attributable to Fujitsu's Direct Marketing Group. Commerce rejected that adjustment because the claim was made for the first time in Fujitsu's pre-hearing brief, too late to be considered or verified. In the opinion of the Court that rejection was fully justified. When a party does not submit information during the period specified by Commerce it is well within the authority of the Department to reject such a submission. *Ansaldo Componenti,*

*S.p.A. v. United States,* 10 C.I.T. 28, 36, 628 F.Supp. 198, 204–05 (1986); *UST, Inc. v. United States,* 9 C.I.T. 352, 357, 1985 WL 25772 (1985).

■ NEC argues that the adjustments to FMV for advertising and sales promotion expenses should have been allocated on a product-line, rather than a model specific basis. Commerce indicates agreement with this argument by concluding that model-specific allocations have led to inaccurate and erratic results in many instances because most companies do not keep advertising records on a model-specific basis; such allocation is susceptible to manipulation designed to reduce dumping margins; and such allocation is burdensome. Commerce requests that the Court order a remand of the proceedings so that all advertising and sales promotion expenses can be allocated on a product-line basis. For this reason, and because courts have held the allocation of such expenses on a product-line basis to be correct, a remand for this purpose is ordered. *See Smith–Corona v. United States,* 713 F.2d 1568, 1581 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

NEC disputes Commerce's circumstance of sale adjustment for warranty expenses on a number of grounds. Those arguments which claim that the treatment of warranty expenses violated the 1980 Settlement Agreement and the Administrative Procedure Act are rejected on the basis that the agreement did not limit Commerce's authority to modify its practices, and that the Administrative Procedure Act does not apply to the means used to reach these results. *See* H.R. 317, 96th Cong., 1st Sess. § 181 (1979).

■ The allocation of warranty expenses on a model-specific basis was legally correct because it was reasonably calculated to arrive at a sound estimate of the costs involved. The mere fact that actual warranty expenses will not be incurred until after the review period does not make it unreasonable to use the per-unit outlay for actual repairs on particular models during a prior period. *See Smith–Corona Group*

*v. United States*, 713 F.2d at 1581. With regard to the labor costs, Commerce disallowed amounts paid by NEC to a related service company. It was eminently reasonable for Commerce to treat them as suspect. In the absence of satisfactory evidence that they would have been the same if paid to an unrelated company, Commerce properly disallowed them.

■ It should be noted here that Commerce also disallowed warranty labor expenses incurred in the home market by Mitsubishi, which also used a related service company. Mitsubishi attempted to show that the costs were reasonable because the related company made a profit, but that does not show conclusively that it made a profit on the services which it performed for Mitsubishi. Given that circumstance of sale adjustments such as this warranty labor adjustment must be "established to the satisfaction of the administering authority" under 19 U.S.C. § 1677b(a)(4)(B), and that it was reasonable for Commerce to require a stronger basis for concluding that services were priced at arm's length, the disallowance of the labor expenses was reasonable.

■ NEC argues that Commerce erred in refusing to make a level of trade adjustment to account for the fact that Commerce was comparing NEC's ex-factory level of trade with home market sales made at the wholesale level of trade. According to NEC, Commerce was obliged to reduce the FMV of purchase price sales in the U.S. by the value attributed to the distribution services of NEC sales companies in Japan. With respect to this claim Commerce stated:

> We do not adjust foreign market value to account for sales companies' profits. Furthermore, NEC did not demonstrate that the claimed selling expenses were related solely to the sales of comparison models. We do, however, consider these expenses indirectly-related selling expenses. Therefore, we included them in the ESP offset and allocated them to the total sales value of all televisions sold in the home market during the period.

53 Fed.Reg. at 4053 (Response to comment 35).

The Court finds that Commerce's insistence that NEC relate the claimed expenses to specific comparison models was lawful and reasonable. Consequently, the refusal to make the adjustment was proper. Moreover, use of home market distribution costs to adjust a US price resembles the technique which Commerce previously rejected, as upheld by this Court in *Fundicao Tupy S.A. v. United States*, 678 F.Supp. 898 (CIT), *aff'd*, 859 F.2d 915 (Fed.Cir.1988).

■ Commerce also refused to deduct home market inland freight from NEC's home market value. NEC claims this violates Commerce's obligation under 19 U.S.C. § 1677e(a) to use the best information otherwise available. NEC argues that in the circumstances prevailing in this case, Commerce should have considered whether the inland freight expenses incurred for exports to the United States was the best information available. The Court finds NEC's argument to be meritorious.

The government argues that the adjustment for differences in freight charges for sales in the two markets involved is a circumstance of sale adjustment which, under 19 U.S.C. § 1677b(a)(4), must be established to the satisfaction of Commerce. According to the government, this empowers Commerce to insist on verification and to refuse to exercise the discretion it has if it decides to rely on its authority to use the best evidence available under 19 U.S.C. § 1677e(a). In other words, the government asserts that if a claimed circumstance of sale adjustment cannot be verified, Commerce may refuse to grant it. The government contends that this view of the law is in harmony with the principle that a more specific legislative enactment or grant of authority controls a more general one. *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974).

The Court finds that Commerce's position would nullify the provision for using the best information available. All provisions of the law which require specific information for a particular adjustment or

**416**

calculation will be more specific than the general provision for utilizing the best information available. Consequently, this statutory structure does not represent a conflict between specific and general provisions, but rather a situation in which related provisions must be harmonized. *See Weinberger v. Hynson Westcott & Dunning*, 412 U.S. 609, 630–31, 93 S.Ct. 2469, 2483–84, 37 L.Ed.2d 207 (1973). With that objective in mind, it is unreasonable to ignore the indirect evidence of inland freight unless there was good ground for believing that it was inaccurate or unreliable. *Atcor, Inc. v. United States*, 11 C.I.T. 148, 159, 658 F.Supp. 295, 303–04 (1987). Commerce should have examined the other evidence offered on this question, and the matter is remanded for that purpose.

■ Commerce's treatment of home market inland freight is also disputed by Mitsubishi for slightly different reasons. In Mitsubishi's case, Commerce found that the expense of inland freight from the factory to a central distribution center was incurred before the sale in the home market, and thus was not a direct selling expense. Mitsubishi argues that Commerce's conclusion as to the sequence of events is not supported by evidence in the record, and that even if the shipments preceded the sales the shipping expenses should be allowed.

The Court has found no evidence in the record to confirm the government's argument that Mitsubishi has indicated that the sales were made after production, and that the televisions in question spent most of the intervening period at the distribution center. In fact, Mitsubishi's letter of March 25, 1987, with respect to storage times (R at reel 2, frames 2524–25) indicates that the VSS units involved were stored at the factory for nearly three times as long as at the distribution center. The 37–inch TV's spent less time at the factory because they were sold more quickly, but they spent no more time at the distribution center than the VSS units. This contradicts Commerce's conclusion that sales were made well after production, and the Court finds that Mitsubishi's claim for an inland freight adjustment as a direct expense should have been granted. That matter is remanded to Commerce for correction.

NEC, Fujitsu and Mitsubishi contend that Commerce erred in calculating the cash deposit rate for estimated dumping duties, and Commerce now agrees. The parties' request that the Court remand the matter to Commerce so that it may make a difference in circumstance of sale adjustment for purposes of calculating the weighted-average percentage cash deposit rate. The Court has, in this case, reaffirmed its position that it is improper to use circumstance of sale adjustments merely to achieve complete tax neutrality. The Court has held that the antidumping law does not support the proposition that a tax differential generated by actual dumping constitutes an adjustable difference in circumstance of sale under 19 U.S.C. § 1677b(a)(4)(B). Accordingly, Zenith's position on this issue is correct, and the Court will not allow an adjustment to the deposit rate.

■ Mitsubishi claims that Commerce erred in making the upward adjustment to US price required by law for the amount of the commodity tax which would have theoretically been assessed against the exported merchandise if the Japanese commodity tax law had been applied to the export sale. Commerce admits that it took the expedient route of calculating the tax amount in question by taking the price between Mitsubishi Electric Corporation (MELCO) and the related Mitsubishi Electric Sales America (MESA), removing transportation costs and packing, and multiplying that adjusted figure by the 20% commodity tax rate in effect during the period of review. It chose not to accept Mitsubishi's demonstration that under the Japanese commodity tax law, the calculation of the tax on U.S. sales would have been based on sales from MESA to its customers, and not on sales between related companies.

Commerce acknowledges that the law requires it to add the putative amount of commodity tax to the U.S. price but offers two rationales for not doing so in exact

conformity with the Japanese commodity tax law. Commerce states that it lacks sufficient expertise in the Japanese commodity tax law to determine that Mitsubishi's analysis of the method for calculating the tax is correct and, in any event, that its circumstance of sale adjustment eliminated the "distortion" of the margin attributable to the commodity tax. Inasmuch as the use of circumstance of sale adjustments to remove perceived distortions in the margins as a resulting from commodity tax has been found to be unlawful by this Court, Commerce is left with the claim that it lacks sufficient expertise to accomplish this determination. Zenith argues that Commerce has more discretion in this decision than it claims, and that it could take the related party price to be an arm's-length transaction, suitable for use under Japanese law in the absence of evidence to the contrary. This leads to Zenith's rather interesting attempt to demonstrate that the record supports the view that sales between MELCO and MESA were at arm's length.

The Court is of the opinion that neither lack of expertise nor wide-ranging discretion would justify Commerce ignoring a thorough demonstration on the record of how the Japanese commodity tax would have applied in this case. The administrative record contains abundant material showing how and why the commodity tax would have been applied to the merchandise in the manner advocated by Mitsubishi. As far as the Court can see, the presentation would have been sufficient to allow Commerce to make an evaluation of the evidence without any extraordinary effort. The Court has been sufficiently informed by the material in the record to reach a decision on this point, to conclude that Mitsubishi's assertions as to the application of the commodity tax law are correct, and to issue implementing instructions for Commerce to follow on remand.

■ The Japanese commodity tax is a consumption tax imposed on manufacturers for administrative convenience on seventeen classes of commodities. There is an assumption that it is passed on to the customers in the form of higher prices. Televisions are Class 2 commodities, on which the tax was 20% during the period of review. Under the Commodity Tax Law there are alternative methods of determining the tax basis to which the tax rate is applied. For televisions, the normal tax basis under Article 11.1(2) of the Commodity Tax Law would be an amount equivalent to the freely offered selling price of the commodity in the place of manufacture.

The Cabinet Order for the Enforcement of the Commodity Tax Law (the "Cabinet Order"), in its Article 9, treats related sales entities as "special selling organizations" or "agency", and provides seven alternative methods of calculating the commodity tax for transactions in which they are involved. Of the alternatives, the first two look for sales of identical or very similar merchandise to a non-special selling organization customer in the preceding month. No such sales took place here. The third alternative is essentially a constructed value approach which builds up the price of a special selling organization to a theoretical unrelated customer from cost of manufacture, selling expenses of the manufacturer, ordinary profit of the manufacturer and selling expenses of the special selling organization and any further special selling organization which might be located in the chain of sale. This method could be used by Commerce but obviously involves a tremendous investigative effort. The Cabinet Order expressly recognizes that this method is difficult and provides an alternative in Article 9.2. Moreover, the level of regulations closest to the taxpayer, known as the Basic Notification Concerning Enforcement of the Commodity Tax Law ("Basic Notification"),[22] make the use of the constructed value method optional with the taxpayer. Mitsubishi has expressed its belief that the constructed value method is infeasible and inappropriate. The Court agrees, and holds that it should not be used.

---

22. This is issued by a subagency of the Ministry of Finance known as the National Tax Administration Agency, which is analogous to our Internal Revenue Service.

The tax basis is determined by Article 9.2 of the Cabinet Order, and the first of the four alternatives is clearly the appropriate method to be applied in this case. In essence, Article 9.2 provides that in the case of an special selling organization removed from the constructed value method and dealing in a commodity normally covered by the aforementioned Article 11.1(2) of the Commodity Tax Law, the tax basis shall be the amount of the special selling organization's price to its customer less an amount representing its profit on that sale. That amount for profit would be 5% under Article 2.2 of the Ordinances issued in 1962 by the Ministry of Finance.

As a result of the above sequence, the Court finds that the Commodity Tax Law tax basis would be 95% of MESA's gross price to the dealer and the commodity tax adjustment should therefore be 20% (0.95 × unit price) or 19% × unit price. The provision in Article 9.2 for price to be based on the preceding month may be safely ignored here, because a definite corpus of completed transactions on which to calculate the tax exists. The Court holds that the tax should be applied directly to those transactions. This issue shall be remanded to Commerce for implementation in accordance with the Court's decision.

 Mitsubishi argues that Commerce erred in the calculation of its home market advertising expense. In the case of Mitsubishi, Commerce's normal practice of dividing the total advertising expenses for the product during the review period by the total sales of the product during that period would have given Mitsubishi nothing. That unbalanced result would have occurred because Mitsubishi concentrated its large advertising campaign for one model in March of 1986, just after the end of the review period. To reach a fair result Commerce departed from its normal method, but not in the direction desired by Mitsubishi. Commerce looked back to Mitsubishi's advertising experience from the previous period and used that as the best information available. Mitsubishi contends that Commerce should have used the data from the final year in which Mitsubishi incurred the advertising expenses, which would have given them the benefit of the expenses incurred in March of 1986. Although Mitsubishi's argument may be in conformity with good business and accounting practice and may be closer to commercial reality, it fails due to the basic principle that substantial evidence need not be the best evidence. The real question is whether the information which Commerce used was so distorted, remote or inaccurate that its use was unreasonable. The authority to use the "best information available" does not require the agency to use more than the information reasonably calculated to provide substantial evidence for a determination. *Atlantic Sugar Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984). The Court concludes that, although Commerce's use of prior advertising expenses may not have been as exact as the information presented by Mitsubishi, it was proper and lawful.

For the reasons given above, it is hereby ORDERED that plaintiffs' motions for judgment on the record are granted to the extent indicated in the opinion, and the case is remanded to the Department of Commerce for the issuance of a new determination consistent with the Court's opinion herein, and it is further ORDERED that Commerce shall issue said determination and transmit it to the Clerk of the Court within 60 days from the date of entry of this decision.