**INDUSTRIAL FASTENERS GROUP, AMERICAN IMPORTERS ASSOCIATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 82–30.**

United States Court of Appeals, Federal Circuit.

June 30, 1983.

Andrew P. Vance, of New York City, for appellant. With him on brief was Michael A. Johnson, New York City, of counsel.

Velta A. Melnbrencis, Washington, D.C., for appellee. With her on brief were J. Paul McGrath, Asst. Atty. Gen., and David M. Cohen, Director, Washington, D.C.

Before RICH, DAVIS and NIES, Circuit Judges.

DAVIS, Circuit Judge.

Industrial Fasteners Group, American Importers Association (appellant or Indus-

trial) [1], appeals the judgment of the United States Court of International Trade (CIT)—together with the denial of appellant's motion for rehearing and vacation of that judgment—in which the CIT affirmed the final, affirmative, countervailing duty determination and order of the International Trade Administration (ITA), United States Department of Commerce, in *Certain Fasteners from India,* 45 Fed.Reg. 48,607 (1980). *See Industrial Fasteners Group v. United States,* 525 F.Supp. 885, 2 CIT 181 (1981), 542 F.Supp. 1019, —— CIT —— (1982), slip op. 82–26 (April 19, 1982). Industrial asks review only of that portion of the CIT's decision affirming ITA's holding that the Government of India, via a policy of its Ministry of Commerce (Ministry), provided subsidies to exporters of certain industrial fasteners through the Cash Compensatory Support on Export (CCS) program. We affirm.

## I

The events leading to this proceeding began with the filing with ITA of a petition by the Industrial Fasteners Institute of Cleveland, Ohio, on January 30, 1980. ITA then initiated an investigation of certain fasteners from India late in February 1980 by the publication in the Federal Register of a notice of the Initiation of Countervailing Duty Investigation, 45 Fed.Reg. 12,276 (Feb. 25, 1980). At that time, the Embassy of India was notified of the investigation and was requested to respond by March 26, 1980, to a questionnaire which included the following specific questions regarding the CCS program:

"(1) Explain the terms and conditions of the program alleged. How are the amounts of payments determined?

(2) Provide current English language copies of laws, regulations and schedules governing the program;

(3) If the program applies only to designated or approved industries, provide a

1. Industrial is a trade association, some of whose members import fasteners from India, which participated as an interested party in the administrative countervailing duty proceedings conducted by the International Trade Administration with regard to certain industrial fasteners from India.

listing of firms exporting the subject merchandise which have received assistance from the program in 1979, or in the most recent one year period for which information was available, and the amounts received;

(4) If the information in (3) above is not readily available, indicate the total amount paid during the same period to firms exporting the subject merchandise."

India's response to ITA's questionnaire, received on March 26, 1980, stated that exporters of industrial fasteners are eligible to receive CCS of 17.5% of the f.o.b. value of their exported product as a refund of indirect taxes paid but not otherwise refunded.[2] In reply to the pivotal question how the 17.5% figure was established, India stated that it "has reasonably calculated and documented the actual tax experience" and explained that following the Alexander Committee's review of the CCS program on October 23, 1978, India's Ministry informed all Export Promotion Councils (EPCs), including the Engineering Export Promotion Council (EEPC) which oversees manufacturers of industrial fasteners, that it was restructuring the program to compensate fully for all types of indirect taxes paid by exporters on inputs which are not otherwise refunded. All EPCs were requested immediately to collect, compile and make available to the Ministry basic data regarding the products with which the EPCs were concerned. They were told that the following "broad criteria . . . are likely to be accepted by Government for formulation of the new rates:"

(1)(a) Indirect taxes on inputs domestic or imported.

(b) High interest rates on working capital.

(c) High cost of capital goods.

(2)(a) Labor intensive industries.

(b) Product of SSI [small sector industry] and cottage sector.

(c) New products in new markets.

(d) Selected processed food, horticulture and agricultural products.

(e) Commodities and markets which suffer from high and discriminatory freight rates.

The Ministry requested the EPCs to select a representative number of manufacturing and exporting units spread throughout the country and to work out the average incidence of the various nonrefundable taxes, duties and levies imposed on inputs entering into the exported products. After receipt of the Ministry's instructions, the EEPC instructed a random number of its approximately 300 members to prepare indirect tax calculations. Replies received were analyzed and sent to the Ministry, including tax calculations from six industrial fastener manufacturers provided by the EEPC. The Ministry then "carefully scrutinized" the tax data and announced on January 15, 1979 a CCS of 12.5% for industrial fasteners to be provided effective April 1, 1979. After objections by the manufacturers to that figure as too low, the Ministry announced on March 31, 1979, a rate of 17.5% for industrial fasteners exported to the American continent.

Included with the Indian Government's initial response to ITA's questionnaire on the CCS program was an undated "Statement Showing Incidence of Indirect Taxes on F.O.B. Export Value/Anchor Bolts." Claiming that this statement contained errors, India requested (by subsequent letter of April 7, 1980) the substitution of the "complete study relating to taxes on anchor bolts" which had been prepared by a Calcutta firm of cost accountants. That study, dated March 11, 1980, was said by the accountants to be a "study of indirect taxes payable/paid and its incidence on Cost Structure of Anchor Bolts exported to the U.S.A." It included consideration of (1) sales tax and excise duty on new materials, sulphuric acid and anti-rust oil, and packing material; (2) entry tax on raw materials and hoop iron, leval (sic) and nails; (3) Joint

---

**2.** India's response noted that the CCS program is a result of Ministry of Commerce policies rather than law or regulation.

Plant Committee CESS (not otherwise explained); (4) engineering goods export assistance fund levy; (5) steel development surcharge/levy; (6) steel import pooling fund levy; (7) port commissioners levy; (8) port congestion surcharges; (9) compulsory government inspection levy, and; (10) interest on duty drawback for a three-month period.

Because ITA determined that India was not a "country under the Agreement" on Subsidies and Countervailing Measures, the countervailing duty investigation was governed by section 303 of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1303 (Supp. V 1981).[3] Section 1303(b) of the 1979 Act provides that countervailing duty "shall be imposed, under regulations prescribed by the administrative authority (as defined in section 1677(1) of this title), in accordance with subtitle IV of this chapter (relating to the imposition of countervailing duties) [19 U.S.C. §§ 1671–1677g (Supp. V 1981), as added by the Trade Agreements Act]."[4] Countervailing duties are imposed according to 19 U.S.C. § 1671(a), which provides in pertinent part:

(a) General Rule.  -If-
(1) the administering authority determines that—[the challenged country]

\* \* \* \* \* \*

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported into the United States, ... then there shall be imposed upon such merchandise a countervailing duty ... equal to the amount of the net subsidy.

It has been held that "the non-excessive remission of an indirect tax is not a bounty or grant[5] within the meaning of the statute." *Zenith Radio Corp. v. United States,*

437 U.S. 443, 448, 98 S.Ct. 2441, 2444, 57 L.Ed.2d 337 (1978) (footnote omitted).

Pursuant to its countervailing duty regulations (promulgated on January 20, 1980, 45 Fed.Reg. 4932 *et seq.*), the ITA used the following three-prong test to determine whether the export payments under the CCS program are subsidies or are non-excessive rebates of indirect taxes paid but not otherwise rebated:

(1) whether the CCS program operates for the purpose of rebating indirect taxes, (2) whether there is a clear link between eligibility for CCS payments and payment of indirect taxes, and (3) whether the government has reasonably calculated and documented the actual indirect tax incidence borne by exported fasteners and has demonstrated a clear link between such tax incidence and the amount of CCS payments.

In concluding that the payments were subsidies, the ITA found the third prong of the test not to have been met, stating that "[o]ur determination in this case turns ... on specific analysis of the relationship between the CCS payments and the incidence of indirect taxes borne by fastener exports. The link between indirect tax incidence and the CCS payments has not been satisfactorily demonstrated." ITA noted specifically that (1) a review of the data on actual indirect taxes paid by the producers which provided information to the Indian Government shows all but one paying total indirect taxes less than 17.5% of the value of the merchandise, (2) even these tax calculations included some payments that the ITA would not consider indirect taxes, and (3) the Indian Government had not provided evidence to demonstrate the precise determination of the tax incidence of any given product sector. In its final determination ITA concluded that "the Government of India provides bounties or grants (subsidies)

---

**3.** Section 1671(c) of the 1979 Act indicates that, in the case of merchandise which is the product of a country other than a country under the Agreement, section 1303 controls.

**4.** We agree with ITA and CIT that none of the exceptions concerning certain § 1303 investiga-

tion procedures added by the Trade Agreements Act is applicable in this proceeding.

**5.** Under 19 U.S.C. § 1677(5), "[t]he term 'subsidy' has the same meaning as the term 'bounty or grant' as that term is used in section 1303 of this title."

within the meaning of section 303 of the Act ..." through three programs, and directed customs officers to assess countervailing duty on imports covered by that determination. As we have noted, Industrial now appeals only the finding by ITA (and affirmance by the CIT) that India provided subsidies—rather than non-excessive indirect tax rebates—to exporters through the CCS lump-sum payment of 17.5% of the f.o.b. value of the exported merchandise.

On the appeal to the Court of International Trade, that court determined ITA's decision to have been supported on the record by substantial evidence and otherwise to be in accord with the law. See 19 U.S.C. § 1516a(b)(1)(B). First, the court found ITA's three-prong test to be a reasonable interpretation of the requirements of the countervailing duty statutes. Second, the court upheld ITA's process of review of the data that went into the determination of the 17.5% figure. Third, the CIT found substantial evidence to support ITA's decision, concluding that "any determination by the ITA as to the extent the CCS payments represented a rebate of indirect taxes paid would be mere speculation" because

(1) ... the evidence clearly establishes that there may be criteria other than indirect taxes paid which are compensable by the CCS rate, and

(2) ... the evidence fails to establish what portion of the 17.5% CCS payment has been allocated to compensate for indirect taxes paid as opposed to that portion allocated to compensate for other criteria, and

(3) ... the evidence fails to establish the actual incidence of indirect taxes on which to base the CCS payments.

Thereafter the CIT denied Industrial's motion for rehearing and vacation of judgment, in which Industrial claimed that the record demonstrates a review and reevaluation of the CCS rate by the Indian Government contemporaneous with the ITA investigation. The court noted that, regardless of any such further evaluation, the record "clearly and undisputedly reveals" that ex-

port handicaps other than indirect taxes were compensated by the CCS rate and that the record fails to provide evidence of the amounts allocated to other export handicaps relative to those allocated to indirect taxes paid.

II

■ The ITA's three-pronged test, set forth in Part I *supra,* is a "sufficiently reasonable" interpretation by the administering agency of the requirements of the countervailing duty statutes and regulations as to withstand judicial challenge. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (and cases cited). The statute's general reference to the foreign country's "providing, directly or indirectly, a subsidy" with reference to imported merchandise (*see* 19 U.S.C. § 1671(a), *supra* ) can appropriately be filled out, as ITA has done in its regulations and in the test applied here. Guideline 2 in Annex 1 to the regulations (promulgated in January 1980) provided (45 Fed.Reg. 4949):

Export payments as an estimate of indirect taxes paid: Generally the payment to an exporter of a lump sum calculated and identified as a non-excessive rebate of the indirect tax incidence on the exported product, and its components, will not be treated as a subsidy *if the government has reasonably calculated and documented the actual tax experience of the product under investigation.* (Emphasis added.)

■ The legislative history of the Trade Agreements Act firmly supports this guideline and demonstrates that Congress wanted such export payments to be free of subsidy treatment only "if those payments are reasonably calculated, are specifically provided as nonexcessive rebates of indirect taxes ..., and are directly related to the merchandise exported." S.Rep. No. 249, 96th Cong., 1st Sess. 85, *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 471. ITA could properly infer that for non-subsidy treatment in this instance Congress called for a showing that (a) the Indian program

had the initial purpose of rebating indirect taxes, (b) there was a clear link between payment of the indirect taxes and eligibility for CCS payments, and (c) the CCS payments were determined on the basis of the actual tax incidence borne by exported fasteners. In other words, Congress wanted more than merely a *post hoc* determination that export payments can now be shown to be equal in amount to indirect taxes paid but not refunded, regardless of how the amount of payments was in fact established. Rather, the intent was that the foreign government show that the calculation of the amount of export payments was reasonable when made, through proof demonstrating the actual basis of those payments in the indirect tax incidence carried by the exported articles.[6]

Industrial strongly objects to this interpretation's focus on the foreign government's past actions with respect to challenged exports. Contending that ITA is restricted solely to deciding the question for the future on the basis of India's calculations and studies during the ITA investigation, appellant stresses the statute's use of the present or future tense (*e.g.,* "*is* providing"; "there *shall* be imposed" in § 1671(a)(1), *supra*). But this use of tense is merely a general and accepted method of drafting for all purposes, and cannot in itself override the scheme of the statute and the legislative history which show that

a so-called "historical linkage" was specifically intended by Congress.[7]

In this connection, Industrial also argues that this "historical linkage" requirement renders null what it calls "the conciliation provision of the statute," 19 U.S.C. § 1671c(b).[8] But this "conciliation" authorization, saying no more than that the administrative agency *may* suspend an investigation in the event of an agreement—which would most likely be sought by the foreign government, the exporters, or the United States importers—is in no way rendered ineffective by the concomitant requirement that an ongoing investigation should include a determination of how the amount of the challenged export payments was actually calculated.

### III

In the light of this understanding of the legal requirements, our review of the record accords with that of the Court of International Trade. We agree that "any determination by the ITA as to the extent of CCS payments represented a rebate of indirect taxes paid would be mere speculation" because of the inadequate information provided by the Indian Government to ITA in the course of the investigation. India made clear, both in its earlier letter to the EPCs describing the "broad criteria ... likely to be accepted" and in its later post-

---

**6.** Appellant argues that even under this standard it met ITA's requirements because ITA found that the CCS payments were not an *ex post facto* rationalization of a pre-existing subsidy. Appellant misses the point. Just because the CCS program itself is not an *ex post facto* rationalization—*i.e.,* it did not have the initial purpose of providing subsidies—does not mean that the payments actually provided have been demonstrated not to be subsidies in effect or in fact.

**7.** Appellant's reliance on alleged prior Treasury Department practice is unavailing in view of Congress' clear purpose not to continue any prior Treasury practice contrary to the 1979 Act's requirements. *See* Part IV, *infra*.

**8.** This part of the statute provides:
Agreements to eliminate or offset completely a subsidy or to cease export of subsidized mer-

chandise. The administering authority *may* suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree—
(1) to eliminate the subsidy completely or to offset completely the amount of the net subsidy, with respect to that merchandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or
(2) to cease exports of that merchandise to the United States within 6 months after the date on which the investigation is suspended.
[Emphasis added.]

investigative accountant's report, that there may be criteria other than indirect taxes paid which are compensable by the CCS 17.5% rate. Appellant counters that India had also explained in its response that this was inconsequential because the actual figure for indirect taxes paid but not refunded was higher than the 17.5% figure. It may be true that only a portion of indirect taxes actually paid is covered by the 17.5% figure but, as noted by the CIT, the information provided by the Indian Government is not satisfactory to determine whether the 17.5% figure is an appropriate one with regard to indirect taxes. Not only was the figure originally set at 12.5% and raised to 17.5% because of more stringent packing requirements for export to North America and not because of indirect taxes paid, but the data base from which the figures were derived came from only six out of approximately 300 manufacturers, only one of which paid more than 17.5% in indirect taxes.[9]

■ Appellant would have us believe that the existence of the accounting report, which was sent as a replacement to the annex to India's initial response to ITA's questionnaire, demonstrates that the Indian Government has reevaluated the 17.5% CCS rate for industrial fastener exports and, based on that accounting report, reaffirmed the correctness of the 17.5% figure. Industrial then asserts that ITA neither verified the information in this report nor considered it in reaching its final determination. Of course, a foreign government could reevaluate an export payment program and in so doing provide adequate proof for the past export payments, but there is nothing in the record to indicate that this accounting report was in any way a part of such an effort by the Indian

Government to review the CCS program. This was not a true review of the kind that ITA might have to accept. Indeed, the accounting report, dated March 11, 1980, would seem to be nothing but an inadequate justificatory gesture in response to the then ongoing countervailing duty determination, which had begun on February 26, 1980. As noted above (Part II, *supra*), we believe that the ITA is entitled under the Trade Agreements Act to an accounting of both how the 17.5% figure was actually established and how it can be supported. Where, as here, the evidence provided by India is insufficient to support the choice of the particular rate as reasonable, the ITA could appropriately impose a countervailing duty in the full amount of the export payment.[10]

## IV

■ Appellant makes much of its contention that the legal tests (discussed in Parts II and III, *supra*) were novel and unknown to India (or the other participants in this proceeding) until ITA completed its investigation. This is claimed to be a denial of due process. The answer is that it should have been known, before this investigation was begun (late in February 1980), from the ITA regulations and the Trade Act's legislative history, that information as to India's actual efforts to calculate the CCS payments would be required—and India simply did not fulfill that requirement of which it should have been aware.

The annex to the regulations (issued in January 1980) expressly provided that a payment "will not be treated as a subsidy if the government has reasonably *calculated and documented the actual tax experience of the product under investigation.*" (Em-

9. The ITA also noted that "these tax calculations included several payments ... that we would not consider indirect taxes which may be rebated on export," such as payments to an import pool fund, a development surcharge, an engineering goods export assistance fund, a port trust fund, port congestion charges, and taxes on electricity and fuel.

10. Because India possessed (or could gather) the necessary facts, the burden was its (not ITA's) to furnish that information. In the absence of such information making at least a prima facie case as to India's proper establishment of the CCS payments, ITA did not have to verify the information supplied by India.

phasis added.) *See* Part II, *supra.* In addition, the Senate Committee report on the 1979 Act had declared that, to be other than a subsidy, the alleged non-excessive tax rebate had to be "reasonably calculated," "specifically provided as non-excessive rebates of indirect taxes," and "directly related to the merchandise exported." *Ibid.*[11] Without more, those specific directives should clearly have alerted appellant (as well as India) to the need for adequate proof of the foreign government's actual calculation of the payments as a non-excessive rebate of taxes with respect to the imported goods. Whether or not such a showing had previously been required by the Treasury Department (in passing on countervailing duty questions) is immaterial. In this aspect Congress did not wish to follow the prior Treasury practice (if it was in fact as appellant asserts it to have been). *See, e.g.,* 125 Cong.Rec. 20166–69 (1979).

In short, appellant (and India) could not properly feel that they did not know, in advance of ITA's investigation, what was required of them to show that the CCS payments were not subsidies. The very wording of India's initial response to ITA's requests, which stated that India "has reasonably calculated and documented the actual tax experience," (see Part I, *supra*), shows that it understood that requirement. As we have held in Part III, *supra,* ITA could allowably determine that this requirement was not satisfied either by India's original response or by the accountant's report submitted later.

For these reasons, the judgment of the Court of International Trade is affirmed.

*Affirmed.*

---

11. This was explicitly confirmed on the floor of the Senate in the course of a statement by Senator Heinz, fully accepted in this respect by Senators Ribicoff and Roth (the managers of the bill). 125 Cong.Rec. 20167, 20169 (1979).