NEC Home Electronics, Ltd. and NEC Home Electronics (USA), Inc., plaintiffs *v.* United States, defendants, and Zenith Electronics Corp., defendant-intervenor

Court No. 89–09–00535

(Decided May 2, 1994)

*Paul, Weiss, Rifkind, Wharton & Garrison, (Robert E. Montgomery, Jr., Robert P. Parker, Janet Lee)* for plaintiffs NEC Home Electronics, Ltd. and NEC Home Electronics (USA), Inc.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *(Velta A. Melnbrencis),* of council: *Terrence J. McCartin,* Import Administration, U.S. Department of Commerce for defendants.

*Frederick L. Ikenson, P.C., (Frederick L. Ikenson, J. Eric Nissley)* for defendant-intervenor Zenith Electronics Corporation.

### Opinion

Musgrave, *Judge:* In this action, plaintiffs NEC Home Electronics, Ltd. and NEC Home Electronics (USA), Inc. (collectively "NEC") challenge the final results of the administrative review of antidumping findings announced by the International Trade Administration, U.S. Department of Commerce ("ITA" the "Department" or "Commerce"): *Television Receivers, Monochrome and Color, from Japan; Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke in Part,* 54 Fed. Reg. 35,517 (Aug. 28, 1989) (the *"Final Results").* The *Final Results* cover several manufacturers and/or

exporters of the subject merchandise for various review period from April 1, 1980 through February 28, 1987. For NEC, the *Final Results* cover the fifth review period (April 1, 1983 through March 31, 1984), the sixth review period (April 1, 1984 through February 28, 1985), the seventh review period (March 1, 1985 through February 28, 1986) and the eighth review period (March 1, 1986 through February 28, 1987). Commerce found dumping margins for NEC of 18.21% for the fifth review period, 7.37% for the sixth review period, 7.16% for the seventh review period and 22.9% for the eighth review period. Plaintiffs have moved for judgment upon the agency record with regard to four basic issues: 1) use of sales to unrelated purchasers rather than to related distributors without a level of trade adjustment; 2) use of sales in all markets in Japan rather than in alleged "principal markets"; 3) treatment of advertising and sales promotion expenses; and 4) failure to make adjustment for home market warranty labor expenses paid to related parties.

## BACKGROUND[1]

During the fifth through eighth review periods, all of NEC's Japan home market television sales occurred at the ex-factory level to NEC-affiliated sales companies ("NECSCs"). *NEC Fifth-Seventh Periods Questionnaire Responses,* Annex A–2 (Conf. A.R. 38 at 35A; Conf. A.R. 38 at 175A; Conf. A.R. 38 at 319A); *Eighth Period Questionnaire Response,* Annex A–2 (Conf. A.R. 72 at 227A). The NECSCs thereafter resold the products at the wholesale level to unrelated parties. *NEC Fifth-Seventh Periods Questionnaire Responses* (May 18, 1987) at C3 (A.R. 103 at 2164; A.R. 104 at 2309; A.R. 105 at 6–7); *Eighth Period Questionnaire Response* (Dec. 7, 1987) at 2 (A.R. 178 at 811). In the United States, all of the NEC's purchase price transactions were large volume ex-factory sales to a small number of unaffiliated equipment manufacturers. *Id.* at 6 (A.R. 103 at 2167; A.R. 104 at 2312; A.R. 105 at 9; A.R. 178 at 814).

## STANDARD OF REVIEW

In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) *(quoting Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229 (1938)). Moreover, the Court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been

---

[1] "A.R." refers to the Administrative Record filed by the Department in this case. All references are to the public documents unless noted as "Conf. A.R.", which refers to documents preserved on the non-public microfilm rolls.

before it *de novo. See American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) *(citing Universal Camera,* 340 U.S. at 388), *aff'd sub nom., Armco, Inc. v. United States,* 3 Fed. Cir. (T) 123, 760 F.2d 249 (1985).

Substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.,* 340 U.S. 474, 488 (1951). The "whole record" means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp.,* 340 U.S. at 478, 488.

DISCUSSION

1. *Commerce's Calculation of Foreign Market Value for NEC:*

A. *Commerce's rejection of NEC's related party sales in Japan:*

The first issue before the Court is whether Commerce erred in refusing to compare foreign market value ("FMV") and United States price ("USP") at the ex-factory level of trade, on the ground that NEC provided no data showing that the transactions were at arm's length. In calculating the dumping margin, Commerce compared the NECSCs' home market *wholesale prices*[2] with NEC's United States *ex-factory prices.*[3] The regulation in effect during the underlying proceeding, 19 C.F.R. § 353.22(b) (1988), provided in relevant part that:

> (b) *Sales to related persons.* If such or similar merchandise is sold * * * in the home market * * * to a person related to the seller of the merchandise * * *, the price at which such or similar merchandise is sold * * * to such person ordinarily will not be used in the determination of foreign market value unless such sales are demonstrated to the satisfaction of the Secretary to be at prices comparable to those at which such or similar merchandise is sold to persons unrelated to the seller.

The regulation authorized Commerce to use the prices at which the merchandise is sold to a related party only if the sales were demonstrated to Commerce's *satisfaction* to be at prices comparable to those at which the merchandise is sold to unrelated persons. In accord with 19 C.F.R. § 353.22(b), Commerce's normal practice is to disregard the manufacturer's prices to its related distributors or dealers in calculating FMV unless the manufacturer has substantiated to Commerce's satisfaction that the prices are at *arm's length. See, e.g., Sodium Acetate from Chile; Final Results of Antidumping Duty Administrative Review,* 53 Fed. Reg. 15,258, 15,259 (Apr. 28, 1988). Hence, the burden is placed upon the respondent to demonstrate that prices to related parties are at

---

[2] *Wholesale prices* reflect (1) the cost of producing the set, plus the manufacturer's profit and (2) the cost of distributor's services, plus the distributor's profit.

[3] *Ex-factory prices* reflect the cost of producing the set, plus the manufacturer's profit.

arm's length. *See Creswell Trading Company, Inc. v. United States,* Nos. 93–1062, –1063, –1064, –1065, –1066 at 10 *et seq.* (Fed. Cir. Feb. 2, 1994); *Zenith Electronics Corporation v. United States,* ____ Fed. Cir. (T) ____, ____, 988 F.2d 1573, 1583 (1993).

Moreover, Commerce was not precluded from using sales from the related party to an unrelated purchaser for calculating FMV when the sales to the related party were *not* demonstrated to be at arm's length by the regulation contained in 19 C.F.R. § 353.19 (1988), which provided in pertinent part that:

> The comparison of the United States price with the applicable price in the market of the country of exportation * * * generally will be made at the same commercial level of trade. However, if it is found that the sales of the merchandise to the United States or in the applicable foreign market at the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made at the nearest comparable commercial level of trade and appropriate adjustments will be made for differences affecting price comparability.

NEC advances two main arguments to support its claim that FMV and USP should be compared at the same ex-factory level of trade. First, NEC argues that it substantiated the arm's length nature of its ex-factory prices, with testimony regarding the Japanese commodity tax. *Plaintiffs' Memorandum,* at 13–15. Second, NEC requested that Commerce compare NEC's ex-factory transactions with the ex-factory transactions which other Japanese respondents in these reviews had with unrelated distributors, in order to confirm the arm's length nature of NEC's sales. *Id.* at 15.

The Court finds NEC's arguments unpersuasive. As to NEC's first contention, NEC provides information generated by the Japanese Government's administration of its Commodity Tax Law. NEC argues that Commerce must accept this information as proof of the arm's length nature of NEC's related party prices under the U.S. antidumping law.

During the relevant time, 19 C.F.R. § 353.46(a)(1) (1988) provided in pertinent part that:

> (a) *Submission of information and written views*—(1) *When and where to file.* Except in situations where it would be manifestly unjust, any information or written views submitted in connection with a proceeding shall be considered only if received within the time established by these regulations or by specific instructions applicable to such submission, any submission received after such time shall not be considered in the proceeding * * *.

Another regulation, 19 C.F.R. § 353.511(b) (1988), provided for the rejection of unverifiable or untimely submitted information:

> Whenever information cannot be satisfactorily verified, or is not submitted in a timely fashion or in the form required, the submitter of the information will be notified and the affected determination will be made on the basis of the best information then otherwise

available which may include the information submitted in support of the petition. An opportunity to correct inadequate submissions will be provided if the corrected submission is received in time to permit proper analysis and verification of the information concerned; otherwise no corrected submission will be taken into account.

Pursuant to Commerce's long-standing price, it rejects information submitted after publication of the preliminary results. *See, e.g., Chevron Steel Plate from Japan; Final Results of Antidumping Duty Administrative Review and Revocation in Part,* 53 Fed. Reg. 15,255 (Apr. 28, 1988); *Final Results of Antidumping Duty Administrative Review; Anhydrous Sodium Metasilicate from France,* 52 Fed. Reg. 33,856, 33,857 (Sept. 8, 1987).

In this case, the preliminary results were published on August 30, 1988. *See Preliminary Results of Antidumping Duty Administrative Review and Intent to Revoke In Part,* 53 Fed. Reg. 33,164 (Aug. 30, 1988). NEC's supporting data on Japanese commodity tax appears in NEC's *Pre-Hearing Brief,* filed on October 24, 1988. *See Affidavit of Mr. Kentaro Kono, NEC Pre-Hearing Brief,* Attachment 1, para. 2 (A.R. 232 at 1657). Commerce rejected NECs attempted use of the Japanese commodity tax base because the claim was made for the first time in NEC's *Pre-Hearing Brief,* too late to be considered or verified. *Defendants' Memorandum,* at 17–18. When a party does not submit information during the period specified by Commerce it is well within the authority of the Department to reject such a submission. *See Manifattura Emmepi S.p.A. v. United States,* 16 CIT 619, Slip Op. 92–115 at 7–8 (July 20, 1992) (Aquilino, J.); *Zenith Electronics Corp. v. United States,* 14 CIT 831, 848, 755 F. Supp. 397, 414 (1990); *Seattle Marine Fishing Supply Co. v. United States,* 12 CIT 60, 68–71, 679 F. Supp. 1119, 1126–28, *aff'd,* 883 F.2d 1027 (1989). If the record indicated lack of adequate warning or of sufficient time in which to respond, resort to best information available ("BIA") would, at least arguably, have been inappropriate. *See, e.g., Daewoo Electronics Co. v. United States,* 13 CIT 253, 266–67, 712 F. Supp. 931, 944–45 (1989). The evidence on the record shows that this is not the case here. The Court finds that Commerce's rejection of NEC's attempted use of the Japanese commodity tax base without reaching the merits of NECs argument is supported by substantial evidence and is in accordance with law.

With respect to NECs second contention, NEC argues that Commerce should have used NEC Home Electronics Ltd. ("NECHE") sales to the NECSCs for calculating FMV because these sales satisfied the arm's length test since the prices for these sales were established upon the basis of "competitive market prices." *Plaintiffs Memorandum,* at 8 and 15–18. According to NEC, Commerce could have confirmed that the prices to the related distributors were at arm's length by comparing NECHE's prices to NECSCs with prices charged by other television manufacturers to their unrelated distributors. *Id.* at 8–9. NEC argues

that this suggestion was necessitated by the fact that NEC did not have access to its competitors' ex-factory prices, while Commerce had such access in the form of the questionnaire responses from those companies. *Id.* at 15.

Further, NEC argues that Commerce used this very method of confirming the arm's length nature of related-party transactions in an earlier review of this antidumping order. *Zenith Radio Corporation v. United States,* 9 CIT 110, 606 F. Supp. 695 (1985), *aff'd,* 4 Fed. Cir. (T) 44, 783 F.2d 184 (1986) *("Zenith I").* In *Zenith I,* Commerce verified the ex-factory home market price of Toshiba (which, like NEC, sells televisions at the ex-factory level only to related companies) by comparing Toshiba's prices to those of manufacturers selling comparable television sets in arm's length transactions. *Id.* at 700. On appeal of *Zenith I,* the court held that the methodology used in that case, "accords with the law and its results are supported by substantial evidence." *Id.*

In the case at bar, Commerce rejected NEC's argument, stating in the *Final Results:*

> We do not agree that prices charged by other manufacturers to unrelated distributors adequately demonstrate the arm's length nature of NECHE's sales to related distributors (NECSCs) because products and production costs may differ from company to company.

*Final Results,* 54 Fed. Reg. at 35,533.

Commerce argues that in order to make my price comparison, there first has to be evidence showing that the products of the other manufacturers are sufficiently similar to those of NECHE. NEC submitted no price or other data relating to products of other manufacturers claiming that it did not have access to the data.[4] *Defendants' Memorandum,* at 11. Furthermore, Commerce argues that even if the products of NECHE and of the other manufacturers were shown to be similar, a price comparison alone is insufficient to establish that NECHE sold its product at arm's length prices.[5] Consequently, Commerce argues that arm's length prices must be demonstrated by production cost data which will show whether, and to what extent, the prices are above cost. *Id.*

With respect to NEC's cite to *Zenith I,* Commerce argues that NEC ignores the fact that, already in 1984, as reflected by the decision in *Sharp Corp. v. United States,* 16 CIT 568, Slip Op. 92–105 at 4 (July 13, 1992), which involved the same final results that are challenged here, Commerce was requesting Sharp (who similarly to NEC sold televisions in Japan to related distributors only) to produce information concerning the sales of televisions from the related distributors to their unrelated dealers in order to determine whether Sharp's sales to its related distributors were at arm's length. Sharp never produced the requested

[4] Commerce argues that NEC fails to explain how NECHE could sell to the NECSCs at "competitive market prices" if it had no access to any data showing what prices were. *Defendants' Memorandum,* at 11, n.22.

[5] There are many variables that control a company's pricing behavior, including the size, location, cost structure, and financial condition of a firm as well as its specific strategy to favor its own related purchasers. *Defendants' Memorandum,* at 11.

information, and Commerce resorted to BIA. This Court held that Commerce's decision to request the information, subsequent use of BIA, and the selection of the information used as BIA were supported by substantial evidence contained in the record and otherwise in accordance with law. *Sharp Corp.,* Slip Op. 92–105 at 12 and 16; *Defendants' Memorandum,* at 13–14.

This Court rejects NEC's implication that Commerce must carry the burden of proving that NEC's related party price is not an arm's length price. As stated above, the applicable regulations presume that a related party price will not be used by Commerce unless the respondent demonstrates that the price is an arm's length price. *See Creswell Trading Company, Inc., supra.* As Commerce noted above, NEC provided no data establishing that its related party sales were made at arm's length prices. NEC's submission of the prices paid by the related distributors, the expenses incurred and profit realized by those distributors, and the prices charged by them to unrelated dealers did not make possible any calculation which would dictate the conclusion that the prices paid by related distributors were at arm's length. Commerce's decision not to use the home market prices to related distributors was supported by substantial evidence and in accordance with law.

### B. *Commerce's rejection of NEC's claim for a level-of-trade adjustment:*

NEC argues that if Commerce did not compare NEC's home market price and USP at the same (ex-factory) level of trade, Commerce was required to adjust FMV to account for differences in the level of trade which affected the home market wholesale price. *Plaintiffs' Memorandum,* at 18. NEC argues that it presented Commerce with data showing the costs incurred by the related home market distributors and the profits they earned, which Commerce verified to be accurate. *Id.* at 20. Further, NEC argues that it presented Commerce with affidavits to the effect that those distributor costs are consistent with average industry costs at the wholesale level. *See Affidavit of Mr. Hatamiya* (President of Brain Child, Inc., an independent consulting firm which conducts research on the audio-visual market in Japan), *NEC Pre-Hearing Brief,* Attachment 2, para. 4 and 5, A.R. 232 at 1662–63; *Affidavit of Mr. Yamazaki, NEC Pre-Hearing Brief,* Attachment 3, para. 5, A.R. 232 at 1665.

Commerce argues that a party claiming a level of trade adjustment must establish the amount of actual, not speculative, expenses incurred as the result of sales at two different levels of trade. *Fundicao Tupy S.A. v. United States,* 7 Fed. Cir. (T) 9, 10, 859 F.2d 915. 917 (1988); *Silver Reed America, Inc. v. United States,* 13 CIT 286 711 F. Supp. 627 (1989); *Zenith Electronics Corp. v. United States,* 14 CIT 831, 755 F. Supp. 397 (1990) *("Zenith I")* (sustaining denial of NEC's claim for level of trade adjustment because of failure of proof). Further, as stated above a person who alleges entitlement for any adjustment pursuant to

19 C.F.R. § 353.19 must establish entitlement to the adjustment to the *satisfaction* of the Secretary. *See* 19 C.F.R. § 353.13 (1988).

Commerce argues that NEC mischaracterizes the sufficiency of its proof. *Defendants' Memorandum,* at 23. NEC's proof consisted only of data regarding the selling expenses of its related distributors, the NECSCs. As Commerce explained in the *Final Results,* it rejected NECs claim for a level of trade adjustment because of NEC's failure of proof:

> NEC has not adequately quantified the difference in price between the two markets (home market sales from NECSC's to unrelated distributors in Japan and PP [purchase price] sales from NECHE to unrelated U.S. distributors) attributable to the different levels of trade.
>
>     *        *        *        *        *        *        *
>
> The burden is on the respondent to support claims for adjustments. We received all of the data submitted by NEC in light of the criteria outlined in results of the PETS remand. Since NEC provided no data indicating that cost differences between the two markets were solely attributable to differences in levels of trade, we determine that no level of trade adjustment is warranted.

*Final Results,* 54 Fed. Reg. at 35,523.

Moreover, the record shows that NEC once again tries to meet its burden of proof by discussing information contained in affidavits which it submitted for the first time in its *Pre-Hearing Brief,* more than two months after the publication of the preliminary results. *Plaintiffs' Memorandum,* at 20–21; *See Affidavits of Mr. Hatamiya and Mr. Yamazaki, supra.* Commerce did not consider this information because, pursuant to its practice, it does not accept new information after publication of the preliminary results. *See Manifattura Emmepi S.p.A., supra.* Commerce's decision to use prices from NEC's related companies to their unrelated purchasers for calculating foreign market value without an adjustment for different levels of trade is supported by substantial evidence and in accordance with law.

Commerce's decision to employ NEC's related distributors' sales to unrelated dealers as the basis for the FMV calculation and to deny NEC's claim for a level-of-trade adjustment is supported by substantial evidence and in accordance with law.

### 2. *Commerce's Decision to Base Foreign Market Value Upon all Sales in Japan:*

NEC argues that Commerce's decision to base FMV upon all markets in Japan rather than only on sales to Japan's principal markets is deficient in three respects. First, NEC argues that Commerce violated the plain meaning of 19 U.S.C. § 1677(a)(1)(A), which requires FMV to be based on sales in the exporting country's principal markets. Second, NEC argues that it submitted evidence establishing Tokyo and Osaka as Japan's principal markets. Third, NEC argues that in using all markets in the exporting country, Commerce reversed its prior practice and

adopted a new "policy" in violation of the rulemaking requirements of the Administrative Procedure Act. *Plaintiffs' Memorandum,* at 25–39.

The term "principal markets" appears in 19 U.S.C. § 1677b(a)(1)(A), which defines FMV. That statute provides, in pertinent part, that the FMV of imported merchandise shall be the price

> at which such or similar merchandise is sold, or, in the absence of sales, offered for sale in the *principal markets* of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade * * *.

(emphasis added).

As to NEC's first argument, NEC argues that the antidumping law is intended to ensure that sales in a highly competitive international market, are to be compared with prices prevailing in similarly competitive markets within the country of exportation. *Plaintiffs' Memorandum,* at 25. In other words, NEC argues that it was Congress' clear intention to require Commerce to distinguish between those markets which are relevant and important for purposes of the statute, and those which are not. *Id.* at 28. Further, NEC argues that Commerce and not the respondent is responsible under the statute for identifying the principal markets. *Id.* at 29. NEC cites no support for its proclamations.

Commerce argues that it has been granted broad discretion by Congress to interpret the term "principal markets." *American Lamb Co v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994,1001 (1986) (citations omitted). Commerce argues that it has interpreted the term "principal markets," in the context of 19 U.S.C. § 1677b(a)(1)(A), as authorizing it to use *all* home market sales of such or similar merchandise that are in the ordinary course of trade and in the usual commercial quantities in calculating FMV, *unless* there is evidence to support an allegation that the principal markets of the country at issue are less than all of the country's markets. *Defendants' Memorandum,* at 28.

In the *Final Results,* Commerce explains that the primary purpose for, in effect, presuming that all home market sales are in the country's principal markets, absent evidence to the contrary, is to enable Commerce to make a fair comparison of home market sales with sales to the United States, all of which are routinely included in calculating U.S. price. *Final Results,* 54 Fed Reg. at 35,522. Commerce also argues that this presumption also is intended to place the burden upon the respondent, which has access to the relevant data, to prove that certain home market sales should be excluded from the FMV calculation. *Id.; See also Creswell Trading Company, Inc., supra; Industrial Fasteners Group v. United States,* 1 Fed. Cir. (T) 81, 88, 710 F.2d 1576, 1582 n.10 (1983) (stating that the party who possessed the necessary facts had the burden of furnishing the requisite information); *Timken Co. v. United States,* 11 CIT 786, 804, 673 F. Supp. 495, 513 (1987) (stating that Commerce acts reasonably in placing the burden of establishing adjustments upon a respondent that seeks the adjustments and has access to the necessary information).

Commerce argues that in *Zenith II, supra,* this Court sustained this interpretation of the term "principal markets." The Court stated that "it was perfectly reasonable for Commerce to view 'principal markets' as those markets throughout the country in which the product was usually sold, and to leave open for exclusion from principal markets only those places in which sales were not normally made." 14 CIT at 847, 755 F. Supp. at 413. Using this standard, the Court holds that Commerce acted reasonably in assigning a meaning of all home markets to the statutory language requiring the use of principal markets.

As to NEC's second argument, NEC argues that it provided detailed evidence to confirm the fact that the Tokyo and Osaka areas are the two most populous in Japan, and are areas in which the majority of home electronics are sold in Japan. *Plaintiffs' Memorandum,* at 29. Specifically, NEC argues that it provided census date from the Ministry of International Trade and Industry ("MITI") indicating that in fiscal year 1984, the Tokyo and Osaka areas accounted for over 50 percent of all wholesale business in Japan, and that over 50 percent of total sales at the wholesale level of home electric appliances in Japan occurred in the Tokyo and Osaka markets. *NEC Pre-Hearing Brief,* Attachment 9 (A.R. 232 at 1700–18).

Again, the record shows that NEC discusses evidence, *i.e.,* data from the MITI, that it submitted after the publication of the Preliminary results. *Plaintiffs' Memorandum,* at 29–31. *See Manifattura Emmepi S.p.A., supra,* and the cases there cited.

In any event, Commerce argues that this Court has held that the type of information as is offered here by NEC was insufficient to establish that the exporting country's principal markets were less than all of the country's markets. *See Zenith II, supra.* In *Zenith II,* NEC similarly sought to restrict Commerce from considering sales outside the Tokyo and Osaka areas, while another respondent sought to limit principal markets to those places in which the majority of home market sales occurred. The Court rejected the claims, stating in pertinent part that:

> Commerce is not restricted to those places in which the majority of home market sales occur. Nor is there any basis in the law to confine Commerce to those markets which are in the most populous sections of the country.

14 CIT at 847, 755 F. Supp. at 413. Based on the discussion above and the evidence contained in the record, this Court need not address NEC's third argument.

In sum, Commerce's decision to base the FMV calculation on sales by all of NEC's related distributors throughout Japan is supported by substantial evidence and in accordance with law. Therefore, the Court affirms the *Final Results* in that respect.

3. *Commerce's Treatment of NEC's Advertising and Sales Promotion Expenses:*

A. *Commerce's treatment of NEC's advertising and sales promotion expenses for the fifth, sixth, and seventh review periods:*

NEC argues that Commerce erred when it used a model-specific quantification methodology to calculate circumstances-of-sale adjustment to FMV for NEC's advertising and sales promotion expenses ("A&SP expenses") for the fifth, sixth, and seventh review periods.[6] NEC contends that Commerce should have used a product-line allocation methodology. *Plaintiffs' Memorandum,* at 38–43.

Commerce replies that it agreed with NEC on this point, and in the *Final Results,* Commerce stated:

> *We agree that advertising and sales promotion expenses should be allocated on a product-line, rather than a model-specific basis.* Although we have used the model-specific allocation in the past, we now believe that model-specific allocation: (1) Leads to inaccurate and erratic results in many instances since most companies do not keep advertising records on a model-specific basis; (2) is susceptible to manipulation by foreign companies in order to reduce dumping margins; and (3) is unnecessarily burdensome for both respondents and the Department. We note, however, that for the eighth review, NEC did not provide any documentation to support its advertising expenses. Therefore, we denied the entire home market [sic] advertising claim. For that review, we allowed only the home market sales promotion claim and U.S. advertising and sales promotion expenses that we were able to verify.

*Final Results,* 54 Fed. Reg. at 35,523 (Response to Comment 25) (emphasis added). Commerce argues that NEC has not pointed to my reference in the administrative record which would indicate that Commerce did not actually do what it stated it did. In other words, Commerce argues that NEC has not substantiated its claim that Commerce committed any error with regard to the A&SP expenses for the fifth, sixth, and seventh review periods without any further inquiry. *Defendants' Memorandum,* at 35.

NEC has failed to point to any evidence that Commerce did not use the product-line allocation methodology which Commerce says it used and NEC argues should be used. In the absence of any evidence cited by NEC to show that Commerce did not do what the *Final Results* say was done, there is no basis for the Court to disturb the *Final Results* in this regard.

B. *Commerce's decision to deny NEC's advertising and sales promotion claims for the eighth review period on the ground that NEC failed to provide supporting documentation:*

NEC argues that Commerce's decision regarding the eighth period A&SP expense adjustment is flawed for several reasons. First, NEC failed to provide the requested information because the model-specific

---

[6] NEC provided Commerce with both product-line and model-specific data for the fifth through seventh review periods, and Commerce verified NEC's response. *Fifth-Seventh Period Verification Report* at 9.

methodology is unnecessarily burdensome for both respondent and the Department. *Plaintiffs' Memorandum,* at 43; *Final Results,* 54 Fed. Reg. at 35,523 (Response to Comment 25). NEC argues that Commerce cannot be allowed to set arbitrary and unreasonable requirements during an investigation, abandon such requirements in the final determination, and they deny the adjustment on the ground that the respondent had not met the arbitrary, and unreasonable standard. *Plaintiffs' Memorandum,* at 43.

Secondly, NEC argues that where a party cannot provide information which Commerce seeks, Commerce must use the best information available ("BIA"). 19 U.S.C. § 1677e(c). NEC contends that in each of the previous questionnaire responses, NEC calculated the percentage of the average price of the comparison models attributable to advertising expenses. *See NEC's Fifth-Seventh Period Questionnaire Responses* at Annex B–12 & Table B–12–6 (A.R. 103 at 2232–35, 2241; A.R. 104 at 2379–80, 2388; A.R. 105 at 46–49, 55). Commerce could reasonably have calculated the A&SP expense adjustment using the most recent calculation from these questionnaires, or in the alternative, it could have selected the lowest percentage from among the three most recent questionnaires. Instead, Commerce ignored the BIA rule and simply refused to make any A&SP adjustment for advertising expenses. *See Rhone Poulenc, Inc. United States,* 8 Fed. Cir. (T) 61, 899 F.2d 1185 (1990) (approving Commerce's use of information from the original investigation as best information available, and requiring Commerce to consider the most recent data as the best information available). *Plaintiffs' Memorandum,* at 44.

Finally, in the verification of the fifth through seventh periods questionnaire responses, Commerce examined NEC's monthly schedule of advertising expenses reported on a product-line basis and verified that it, and NEC's other records, accurately reflected NEC's expenses. *Fifth-Seventh Periods Verification Report* at 9. NEC provided the corresponding schedule for the eighth period. *See NEC's Eighth Period Questionnaire Response,* Annex B–12, Table B–12–2 (A.R. 178 at 874–76, 877). NEC argues that once Commerce determined to use the product-line methodology and verified that NEC's monthly advertising schedules accurately reflected NEC's expenses, Commerce easily could have calculated the appropriate A&SP adjustment using the data provided for all of the periods under review, including the eighth period.[7] *Plaintiffs' Memorandum,* at 45.

Commerce counters that prior to verification of NEC's data for the eighth review period, NEC was advised by a two-page letter and attached verification outline 1) to prepare a worksheet listing all advertising expenses for each month of the review period, and 2) to be prepared to provide all supporting documentation *(i.e.,* invoice, proof of

---

[7] NEC contends that although Commerce did not report that it verified the accuracy of the monthly schedule for the eighth period, in fact Commerce verified only one of the schedules provided for the fifth through seventh periods. Having concluded on the basis of one check that the data were accurate for three periods, Commerce easily could have used the same source to calculate the appropriate, adjustment for the last period. *Plaintiffs' Memorandum,* at 45 n.21.

payment, entry in the appropriate ledger of accounts, proof of bank deposit, *etc.)* relating to advertising for April 1986.[8] Commerce argues that the verification report makes clear that NEC failed to supply any of the supporting documentation:

> *HOME MARKET ADVERTISING:*
>
> NEC made an extensive advertising in its December 7, 1987 submission to the Department. However, at verification the company did not provide any documentation to support its original claim. Company officials said they were not prepared to supply any supporting documentation as requested in the verification outline. Therefore, we were not able to verify any portion of the home market advertising claim.

*Defendants' Memorandum,* Attached Exhibit 1 at 13.

Consequently, Commerce was unable to verify if any of the claimed home market advertising expenses were actually incurred. Thus, Commerce denied NEC's claim for home market advertising expenses because Commerce need not grant a circumstance-of-sale adjustment unless the party claiming it has established its entitlement to the adjustment to Commerce's satisfaction. *See* 19 U.S.C. § 1677b(a)(4). Defendants also cite to 19 C.F.R. § 353.13 (1988); *Asociacion Colombiana de Exportadores de Flores v. United States,* 8 Fed. Cir. (T) 97, 100, 901 F.2d 1089, 1093 (1990), *cert. denied,* 111 S.Ct. 136 (1990) (stating that, under the regulations, the respondents had the burden of establishing their entitlement to the particular adjustment).

In addition, Commerce argues that NEC's reliance upon the BIA statute, 19 U.S.C. § 1677e, is completely without merit. Commerce argues that the statute does not require Commerce to make an adjustment, using as BIA information from an earlier period, when, upon verification, the claiming party fails to supply any supporting documentation for the entire adjustment for the later period. *Rhone Poulenc, Inc., supra,* also relied upon by NEC, did not endorse an adjustment using BIA in circumstances in which a respondent did not substantiate its claimed adjustment. The court simply affirmed Commerce's resort to the highest prior margin as the dumping margin for to the period in question when the respondent submitted inadequate responses. *Rhone Poulenc, Inc.,* 899 F.2d at 118 7–91; *Defendants' Memorandum,* at 38–39.

Regardless of the methodology to be used for manipulating the advertising expenses, Commerce must be able to verify the accuracy of the expenses reported. NEC has failed to supply evidence establishing the amount of NEC's eighth-period home market advertising expenses. For

---

[8] *ADVERTISING:*

Prepare a worksheet listing all advertising expenses for each month of the review period * * *.

In addition to the worksheets, you should have available copies of all printed ads for April 1986, September 1986, and February 1987. You should be prepared to provide all supporting documentation (invoice, proof of payment, entry in the appropriate ledger of accounts, proof of bank deposit, *etc.)* relating to advertising for April 1986. Where you use allocations, you must prepare worksheets documenting the source of the allocated numbers and explain in detail the allocation methodology.

*Verification Outline,* P.M.R. No. 2 at Fr. 1165.

Commerce to make an adjustment for such expenses under the circumstances would be contrary to the requirement that Commerce's decision be supported by substantial evidence on the record.

In sum, the Court holds that NEC failed to provide any evidence which shows that Commerce did employ a model-specific quantification methodology to calculate NEC's cost of sale adjustments for advertising and sales promotion expenses in the fifth-seventh review periods. In addition, Commerce's denial of NEC's adjustment claim for home market advertising in the eighth review period is supported by substantial evidence and in accordance with law. For these reasons, Commerce's treatment of NEC's advertising and sales promotion expenses in the *Final Results* will not be disturbed.

*4. Commerce's Treatment of NEC's Claim for a Circumstances-of-Sale Adjustment for Home Market Warrant Labor Expenses:*

NEC argues that Commerce erred when it decided to deduct NEC's warranty labor expenses from the calculation of FMV solely because NEC's service contractor is related to NEC. NEC argues that Commerce should have treated its home market warranty labor costs as direct expenses, *i.e.,* made a circumstances-of-sale adjustment to FMV for the labor costs. *Plaintiffs' Memorandum,* at 46–53.

The plain language of the statute, 19 U.S.C. § 1677b(a)(4), provides that Commerce make a circumstances-of-sale adjustment *only* when established to its *satisfaction.* The applicable regulation states:

> (a) *In general.* In comparing the United states price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.
>
> (b) *Examples.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in * * * guarantees, *warranties* * * *.

19 C.F.R. § 353.15 (1987) (emphasis added).

In support of its position, NEC cites *AOC International, Inc. v. United States,* 13 CIT 716, 721 F. Supp. 314 (1989) (Watson, J.) *("AOC International"),* in which, this Court rejected such an interpretation of the regulations, and held that the FMV calculation should be adjusted for home market warranty labor expenses even where the labor was conducted by the manufacturer *in house:*

> The Court does not accept the ITA's rationale that the in-house labor costs, which are incurred in servicing of warranty repairs are fixed overhead costs which a company incurs irrespective of the terms of the sales under consideration. It would be contrary to com-

> mon sense to maintain a warranty servicing department and to pay salaries to the in-house servicemen, if no warranty terms were offered on the CTV sales. Similarly, a much smaller servicing department would be necessary to service warranties with more limited terms. The mere fact that in-house servicemen receive 'fixed' salaries does not mean that the warranty-labor cost of the company is a fixed overhead expense which the company must incur irrespective of the terms of the sales under consideration. A per sale allocation of warranty-labor would vary depending on the terms offered with regard to each sale.

13 CIT at 718, 721 F. Supp. at 31–17.

Furthermore, NEC argues that the Court in *AOC International* rejected any notion that the regulations limits the adjustment to "direct" expenses. The Court held that the regulation requires a "direct" connection only between the warranty expense and the *bona fide* difference in circumstances-of-sale; it does not provide that the adjustment capture only those costs characterized as a "direct" expense. *Plaintiffs' Memorandum,* at 50. "[A] cost component of a directly-related expense is not a separate selling expense which must independently meet the 'direct relationship' test under the regulations, but is a proper measurement of the directly-related warranty expense." *AOC International,* 13 CIT at 719, 721 F. Supp. at 318. Once Commerce has determined that the warranty expenses, are directly-related to the sales at issue, "[t]here is no further requirement that each cost component of the directly-related selling expense must independently qualify as a directly-related selling expense in order to be included in the calculation of an adjustment." *Id.,* 13 CIT at 719, 721 F. Supp. at 317.

NEC also argues that Commerce capriciously applied two separate standards to NECs U.S. and home market warranty expenses and impermissibly skewed the comparison of the U.S. price and the FMV in favor of a higher dumping margin. *Plaintiffs' Memorandum,* at 51. NEC points to the *Final Results* in which Commerce states:

> Because NEC did not identify or quantify for its ESP sales which portions of its claimed U.S. warranty expenses were attributable to specific labor and parts, we considered the full warranty expenses to be direct sell in expenses and adjusted ESP accordingly. From FMV we deducted only those portions of claimed home market expenses which NEC demonstrated were directly to sales of comparison model televisions.

*Final Results,* 54 Fed. Reg. at 35,523 (Response to Comment 28). Thus rather than deny NEC an adjustment at all on the ground that NEC's U.S. and home market warranty expenses were not direct expenses, NEC argues that Commerce penalized it unfairly. *Plaintiffs' Memorandum,* at 51. Commerce treated NEC's U.S. warranty labor expenses as direct expenses, thereby lowering the U.S. price. Meanwhile, Commerce treated a portion of NEC's Japanese warranty labor expenses as indirect expenses, and denied any adjustment for the remainder. Commerce

thereby denied any adjustment of FMV. Therefore, having lowered the U.S. price and holding the foreign market constant, NEC argues that Commerce artificially inflated the dumping margin. *Id.* at 52.

Commerce argues that it does not consider payments between related parties as being directly-related to the sales under consideration for purposes of the Circumstances-of-sale adjustment.[9] *See e.g., Television Receiving Sets, Monochrome and Color, from Japan; Preliminary Results of Administrative Review of Antidumping Finding,* 46 Fed. Reg. 12,221 (Feb. 13, 1981), where Commerce explained it considers "such payments to be intra-corporate transfers of funds rather than expense directly related to sale" and, therefore, not appropriately the basis for an adjustment. Otherwise, foreign respondents could evade the effects of the antidumping law by increasing payments to related parties in the home market *Defendants' Memorandum,* at 39–40. *Accord, Television Receiving Sets, Monochrome and Color, from Japan; Final Results of Administrative Review of Antidumping Finding,* 46 Fed. Reg. 30,163, 30,165 (June 5, 1981) (Response to Comment 16).

Commerce argues that NEC does not present a new argument based upon *AOC International, supra. Defendants' Memorandum,* at 41. Commerce argues that Judge Wilson who issued the decision in *AOC International,* upon which NEC relies, is the same judge who later issued the *Zenith II* decision. *Id.* at 42. Thus, Commerce argues that *Zenith II* as the late decision must be deemed to represent the Court's current view of the issue. *Id.*

In *Zenith II,* the Court stressed that NEC's home market warranty labor expenses reflected payments to a related company which NEC had not shown to be arm's length payments. In contrast, the Court in *AOC International* stressed that the home warranty labor expenses reflected wages paid to the respondent's own employees. In other words, the respondent manufacturer had made no payments to any related service company. Rather, the respondent manufacturer performed warranty repairs in-house, and the issue before the Court was whether the respondent manufacturer's warranty labor costs could serve as the basis for an adjustment. The Court rejected Commerce's contention that these costs were fixed overhead expenses. Instead, it found that they were variable overhead expenses, which could be treated as directly-related to the sales under consideration, and therefore could properly serve as the basis for an adjustment. *AOC International,* 13 CIT at 717–19, 721 F. Supp. 31–17.

In this case, there is a lack of satisfactory evidence that the warranty labor costs would have been the same if paid to an unrelated company. The circumstances-of-sale adjustments such as this warranty labor adjustment must be *established to the satisfaction of the administering*

---

[9] As stated by Commerce in its *Final Results:*

Because NEC's service contractor is directly related to NEC, we consider the labor portion of the warranty claim to be a fixed cost, not directly related to the sales under consideration. For such warranty coverage to be considered a direct selling expense, it must represent a variable cost as the result of an arm's length transaction.

*Final Results,* 54 Fed. Reg. at 33,524 (Response to Comment 26).

*authority* under 19 U.S.C. § 1617b(a)(4)(B). The Court finds that it was reasonable for Commerce to require a stronger basis for concluding that services were priced at arm's length. For these reasons, Commerce's denial of NEC's claim for adjustment for warranty labor expenses is supported by substantial evidence and in accordance with law. Therefore, the Court affirms the *Final Results* in that respect.

### CONCLUSION

After considering all of plaintiffs' arguments, the Court makes the following holdings: (1) Commerce's refusal to use related party sales for calculating FMV and without making a level of trade adjustment is supported by substantial evidence and is in accordance with law; (2) Commerce's decision to calculate NEC's dumping margins for the fifth though eighth periods based on sales in all markets in Japan is supported by substantial evidence and is in accordance with law; (3) Commerce did not employ a model-specific quantification methodology to calculate NEC's cost of sale adjustments for advertising and sales promotion expenses in the fifth-seventh review periods, and Commerce's denial of NEC's adjustment claim for home market advertising in the eight review period is supported by substantial evidence and is in accordance with law; (4) Commerce's decision to deny NEC's claim for a circumstances-of-sale adjustment for home market warranty labor expenses is supported by substantial evidence and is in accordance with law. Therefore, the *Final Results* are affirmed and NEC's motion for judgment upon the agency record is denied.